[No. C058030. Third Dist. Feb. 11, 2009.]

In re DARIN PALERMO on Habeas Corpus.

1098

COUNSEL

Law Office of Benjamin Ramos and Benjamin Ramos for Petitioner Darin Palermo.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and Pamela B. Hooley, Deputy Attorneys General, for Respondent State of California.

OPINION

**SCOTLAND, P. J.**—In June 1987, when he was 21 years old, Darin Palermo (defendant) fatally shot his former girlfriend, Andrea Naftel (the victim), while she was sitting on the toilet in the bathroom of defendant's apartment.

According to defendant's version of the incident, he and the victim had planned to go target shooting together. Believing that he had emptied the bullets from his revolver, defendant foolishly began to play "cowboy" and dry fired the weapon twice as he walked down the hallway toward the bathroom. He then stood in the open doorway to the bathroom, took aim, and fired the weapon, fatally shooting the victim. Stunned because he thought that the gun was unloaded, he called his sister and 9-1-1, and gave the victim mouth-to-mouth resuscitation until emergency assistance arrived. He believed that he committed manslaughter because he did not intend to kill the victim.

The People presented a different scenario. After dating and living with defendant, the victim moved out of defendant's apartment. There appeared to be some tension between them after defendant began dating another woman and the victim would enter the apartment without defendant's knowledge or consent while his new girlfriend was there. Defendant was experienced with firearms and knew better than to point even an unloaded weapon at someone. The victim was in a defensive position when she was shot. A boy passing outside heard a woman scream before a shot was fired. Defendant initially lied and said that the victim had shot herself. He hid the expended bullet casing after the shooting. When the weapon was unloaded properly, all of the bullets typically fell out of it making it unlikely—although not impossible—that one of the bullets would have accidentally remained in the gun as defendant claimed.

Jurors rejected defendant's claim of manslaughter and convicted him of second degree murder. He was sentenced to an indeterminate term of 15 years to life in state prison.

At defendant's third parole hearing in March 2006, the Board of Parole Hearings (the Board) found defendant was not suitable for parole due to the nature of the commitment offense, defendant's disciplinary history, and his lack of insight into his behavior that resulted in the victim's death.

Defendant contends there is no evidence he poses a current danger to the public safety; thus, the Board abused its discretion by failing to set a parole release date. We agree and shall grant defendant's petition for writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was born profoundly deaf and has only minimal hearing in one ear. He is able to read lips and, after receiving years of speech therapy, he is able to communicate fairly well but has a fourth grade reading level.

Defendant and the victim, who was also hearing impaired, had known each other since childhood. They dated and then lived together, but defendant asked the victim to move out when she was unable to help pay the bills. They remained friends after she moved from the apartment in March 1987.

A week after the victim moved out of the apartment, defendant began dating Laura Smith. According to Smith, defendant was not pleased when the victim would let herself into the apartment without his knowledge and consent, and the victim displayed some hostility toward Smith. Smith testified that defendant owned a handgun, and the two had gone target shooting with the weapon. Defendant always used appropriate gun safety and had warned her never to point the weapon at anyone.

Two days before the shooting, Smith spent the night with defendant before leaving town for the weekend. The following night, the victim stayed with defendant; and the next day they went to the home of defendant's sister, Tallie Pittman. Pittman and other witnesses said that the victim and defendant appeared to be on good terms. They returned to his apartment to decide what else to do that day.

According to defendant, while the victim went to the bathroom, defendant decided they should go target shooting. He got his revolver and emptied the bullets onto the bed as a precaution prior to transporting it to the target range. He did not count how many bullets had fallen out of the gun. He then walked toward the bathroom and dry fired the weapon twice without incident. Through the open bathroom door, he saw the victim sitting on the toilet reading a magazine. Defendant began playing "cowboy" with the gun, and the victim laughed. Believing the weapon was not loaded, defendant pointed

the gun at her, pulled the trigger, and shot her. The victim got up from the toilet and walked several steps toward defendant, who pulled her into the hall and placed her on the floor. The bullet had pierced the victim's forearm, and a bullet fragment had penetrated her chest.

Defendant did not know what to do so he called his sister, Pittman, telling her the victim had shot herself. Pittman advised defendant to call 9-1-1. Before emergency assistance arrived, he pulled up the victim's pants and tried to give her mouth-to-mouth resuscitation.

When the police arrived, defendant said the victim had shot herself. While one of the officers was standing by the patrol car, a boy approached and stated he heard a woman scream and then two shots. A neighbor who lived across the street also heard gunfire but did not hear any screams.

Defendant testified that because he was afraid of what might happen, he lied to his sister and to the police about the victim shooting herself, and he unloaded the one shell that had been in the gun, put it in his pocket, and left the shell in the police car.

Both the prosecution and the defense introduced extensive blood spatter evidence. The prosecution attempted to show that the victim was kneeling on the floor in a defensive position at the time of the shooting. The defense attempted to show that, although the victim's arm was raised in front of her at the time of the shooting, she remained on the toilet. The defense expert testified the prosecution expert's methodology was significantly flawed.

Michael Giusto, a criminalist for the California Department of Justice, explained that defendant's gun holds six cartridges and that, if the cylinder is fully open, the unexpended cartridges will simply fall out. A person need only look in the cylinder to see if any cartridges remain. When the prosecutor asked defendant to demonstrate how he unloaded the weapon, all of the bullets fell out. However, using defendant's handgun, the defense firearms expert showed that it was possible to leave one round in the cylinder when unloading the weapon if the cylinder was not fully open, and that the cylinder might not open completely if the gun was tilted. Using a blank shell, the expert demonstrated that a bullet left in the cylinder in this manner would be fired by the third pull of the trigger.

Defendant acknowledged he knew better than to point a gun at another person, but explained he had begun to exhibit bad judgment after he was in an accident in which he totaled his truck and hit his head. For example, he had a job at a sign shop and his employer, Tony Guebara, had given him a raise in May 1987 for good job performance; but Guebara fired defendant

later that month, about a week before the shooting, because defendant's job performance declined drastically after the truck accident. Guebara thought defendant's memory was much worse after the accident.

A professor of neuropsychology opined that when defendant hit his head, he suffered a temporary decline in mental functioning. This caused defendant to exhibit impulsive behavior and poor judgment, such as that demonstrated by his uncharacteristically negligent conduct with the gun when he shot the victim. The prosecution presented evidence countering this theory.

Rejecting defendant's theory of manslaughter, the jury convicted him of second degree murder.

The probation report prepared for the sentencing hearing revealed that defendant has no prior criminal convictions or juvenile adjudications. He insisted he thought the gun was unloaded, he never meant to kill the victim, and he was shocked that he was convicted of murder rather than manslaughter. Defendant's parents believed he was convicted of murder because of his limited language skills and inability to " 'communicate grief' regarding the shooting of [the victim]." In contrast, the victim's parents were adamant that defendant murdered their daughter because he was depressed about totaling his truck, losing his job, and the victim's refusal to move back in with him. Defendant expressed remorse for the victim's death and her parents' suffering.

The probation officer opined that defendant's efforts to lie and hide the shell casing were the actions of a frightened young man with "profound physical and intellectual limitations" and that, although defendant knew better than to point a weapon at anyone, let alone pull the trigger, such accidental shootings happen even among experienced professionals.

Psychological evaluations and reports during his incarceration indicated that defendant has been consistently remorseful for what he insists was an unintentional shooting, he has never engaged in any violent behavior in prison, he has obtained job skills, and he has "been programming well during the course of his incarceration." For example, a psychological report to the former Board of Prison Terms prepared in 1997 noted the following: Defendant expressed a great deal of remorse for the offense, stating, "It really shocked me." He was very sorry for the victim's family, whom he had known since he was a small boy. He could never forget what occurred and asked his father to sell all of his guns.

The life-term inmate mental health evaluation prepared in 2002 stated that, because of his profound deafness, defendant attempted to secure tutorial

assistance in prison but was not as successful as he had hoped. Nevertheless, he had "programmed in excellent fashion while in prison"—receiving "a number of laudatory chronos," a certificate of apprenticeship, and a certificate for upholstery repair, and completing the "Total Quality Management Program" and "The Road to Freedom" program. In the view of the psychologists who prepared the report, defendant's potential for violence was "low/average for the general male population in the open community." He had job prospects and family support, and was "a very favorable prospect for return to the community where it is predicted he will adjust well and do well for himself and others." The psychologists noted that defendant still thought about the victim, was remorseful for her suffering and demise, and acknowledged he deserved to be punished for causing her death; but he believed a conviction for manslaughter was "more appropriate" because "[h]e never meant to kill her."

His most recent life-term inmate mental health evaluation, prepared in 2005, stated that defendant worked as a clerk in plant operations and received "above average to outstanding work reports" and a "[l]audatory work chrono in March 2003"; he completed a college course, took classes on "Women's Perspectives," "Advanced Biblical Applications," and ceramics; and he completed a coping skills group and four individual psychotherapy sessions, after which treatment was discontinued because the psychologist did not think any further treatment was necessary.

According to the evaluation, defendant expressed "a great deal of sorrow and remorse for the victim's family," apologized again for his actions, "explored the [commitment] offense in a number of different ways in both individual and group psychotherapy when it was available to him," continued "to program actively," and took "full responsibility for this crime" while asserting that "it was an accidental shooting and [he] never in any way meant to harm the victim." If paroled, defendant planned on living with his "very supportive family." He had two job offers and "several job skills." The psychologists who prepared the evaluation opined that defendant presented "a lower risk to the community if granted a release as compared to the average citizen in the free society."

Defendant's prison misconduct is limited. In February 2003, he received a "form 115" reduced to a form "128-A Counseling Chrono" for misusing a state copy machine to make unauthorized copies.[1] In August 2002, he received a form 115 for theft of state property (a fan from an office machine

---

[1] When an inmate commits misconduct that "is believed to be a violation of law or is not minor in nature," it is reported on a "Form 115, Rules Violation Report," whereas, minor misconduct is documented on a "Form 128-A, Custodial Counseling Chrono." (Cal. Code Regs., tit. 15, § 3312.)

was found in his cell; according to defendant, he was standing in his cell doorway when an inmate handed him a bag to give to his cellmate, defendant did not know the fan was in the bag, and his cellmate confessed that the stolen fan belonged to him, not to defendant). In 1994, he received a form 115, later reduced to a "Division F," for participating in a work strike ("which virtually all inmates at [Deuel Vocational Institution] received if they were working at that time"). Defendant had "never received any [d]isciplinary or [c]ounseling [r]eports for any kind of violence while incarcerated."

At defendant's third parole hearing in March 2006, the Board found that he was not suitable for parole due to the nature of the commitment offense and his disciplinary history. And stating "I'm not entirely sure how much insight you have into your own behavior," a member of the Board "encourage[d] [defendant] to continue to work in the area of self-help to continue to build insight."

Finding that some evidence supported the Board's decision, the San Joaquin County Superior Court denied defendant's petition for writ of habeas corpus.

Defendant then filed a petition for writ of habeas corpus in this court, which ordered the superior court to reconsider the petition in light of *In re Lee* (2006) 143 Cal.App.4th 1400 [49 Cal.Rptr.3d 931] (hereafter *Lee*).

The superior court denied the petition again, concluding that *Lee* contravened the California Supreme Court's decisions in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (hereafter *Rosenkrantz*) and *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (hereafter *Dannenberg*).

Defendant filed another petition for writ of habeas corpus in this court, and we issued an order to show cause. Thereafter, the California Supreme Court decided *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (hereafter *Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (hereafter *Shaputis*), clarifying its decisions in *Rosenkrantz* and *Dannenberg* and the limits on the Board's broad discretion to deny parole. We then asked the parties to submit supplemental briefs addressing those decisions. They have done so and, as we will explain, we are persuaded that the Board abused its discretion in denying defendant a parole release date.

## DISCUSSION

### I

■ The following legal principles guide our review of the Board's decision: One year prior to the minimum eligible parole release date of an inmate sentenced to an indeterminate prison term, the Board must "normally set a parole release date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen. Code, § 3041, subd. (a).) The Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).)

The Board is required to "establish criteria for the setting of parole release dates." (Pen. Code, § 3041, subd. (a).) A panel of the Board must determine whether the life prisoner is suitable for release on parole, and "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a); further section references are to title 15 of the California Code of Regulations unless otherwise specified.)

■ The Board's regulations set forth nine factors tending to show suitability for release on parole: (1) the absence of a juvenile record; (2) a history of reasonably stable social relationships with others; (3) tangible signs of remorse; (4) the commission of the crime resulted from significant stress, especially if the stress had built over a long period of time; (5) battered woman syndrome; (6) a lack of a history of violent crime; (7) increased age, which reduces the probability of recidivism; (8) marketable skills and reasonable plans for the future; and (9) responsible institutional behavior. (§ 2402, subd. (d).)

Factors tending to demonstrate unsuitability for release on parole include the inmate's (1) commission of the offense in an especially heinous, atrocious, or cruel manner; (2) previous history of violence; (3) unstable social history; (4) prior sadistic sexual offenses; (5) lengthy history of mental problems; and (6) serious misconduct in prison or jail. (§ 2402, subd. (c).)

The importance of those factors is left to the discretion of the parole panel (§ 2402, subds. (c), (d)), and judicial review of the Board's parole decisions is very limited. "[T]he precise manner in which the specified factors relevant

to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

However, the deferential review accorded the Board's decision does not mean that courts simply rubberstamp its determination as long as there is some evidence to support any of the unsuitability factors; the "standard is unquestionably deferential, but certainly is not toothless." (*Lawrence, supra*, 44 Cal.4th at p. 1210.) Rather, the reference in *Rosenkrantz* to some evidence to support the Board's decision to deny parole means its ultimate decision that the inmate poses a current risk of danger to society if released from prison. (*Lawrence, supra*, 44 Cal.4th at pp. 1210, 1212; see also *Lee, supra*, 143 Cal.App.4th at p. 1408; *In re Tripp* (2007) 150 Cal.App.4th 306, 313 [58 Cal.Rptr.3d 64].)

■ Accordingly, "to give meaning to the statute's directive that the Board *shall normally* set a parole release date ([Pen. Code,] § 3041, subd. (a)), a reviewing court's inquiry must extend beyond searching the record for some evidence that the commitment offense was particularly egregious and for a mere *acknowledgement* by the Board or the Governor that evidence favoring suitability exists. Instead, under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra*, 44 Cal.4th at p. 1212, original italics.)

There must be something "more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness. 'It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.' [Citation.]" (*Lawrence, supra*, 44 Cal.4th at p. 1210.)

██ With respect to the aggravated circumstances of the commitment offense, "the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1211.) In other words, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214, original italics.)

Thus, "the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. [Citation.] Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense. Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [Citations.]" (*Lawrence, supra*, 44 Cal.4th at p. 1221.)

██ In sum, the Board "may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Lawrence, supra*, 44 Cal.4th at p. 1221, original italics.)

## II

Defendant contends the factors cited by the Board in support of it finding that he was unsuitable for parole do not demonstrate he is a *current* danger to the public safety; thus, the Board abused its discretion in denying parole.

The applicable factors tending to show suitability for release on parole apply to defendant—he does not have a juvenile record or a history of violent crime; he has consistently shown remorse and taken responsibility for the victim's death; he has a history of reasonably stable social relationships with others; he has grown from an impulsive 21-year-old man in 1987 into a more mature middle-aged man, which reduces the probability of recidivism; and he has marketable skills and reasonable plans for the future. (§ 2402, subd. (d)(1)–(3), (6)–(8).) His psychological evaluations also suggest that he does not present a significant risk of danger to the community; indeed, the most recent evaluation concludes that he presented "a lower risk to the community if granted a release as compared to the average citizen in the free society."

Nevertheless, the Board found those markers of suitability for parole were outweighed by the nature of defendant's commitment offense, his disciplinary history in state prison, and what the Board perceived to be his inadequate insight with respect to his behavior in killing the victim.

It is readily apparent that the nature of the killing was the primary basis for the Board's conclusion that defendant would pose an unreasonable risk of danger if released from prison at that time. In the words of the presiding commissioner: "The bottom line is this, Mr. Palermo, this was an awful, awful crime." However, even if we assume (but not decide) that the circumstances of the killing support a finding that it was "especially heinous, atrocious or cruel" (§ 2402, subd. (c)(1)), "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214, original italics.)

The killing was defendant's first criminal offense, and he has not committed any violent acts during the 21 years since the murder—facts that indicate the killing was an isolated incident which does not "realistically constitute a reliable or accurate indicator of [defendant's] current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1219.) And the Board commended him for

his participation in self-help programs in prison that constitute "specific efforts . . . toward rehabilitation" and favor a finding that defendant will not pose a danger to public safety if released on parole. (*Id.* at pp. 1213–1214, 1219, 1226.) In addition, his psychological evaluations suggest that defendant does not present a significant risk of danger to the community if released on parole.

Thus, we turn to the two other factors cited by the Board, along with the circumstances of the killing, as indicators that defendant would have posed a risk to public safety if paroled.

In the Board's view, defendant's "disciplinary history while he's been incarcerated" indicates that defendant remains a danger to public safety, as demonstrated by the killing. The inference is unsound because the disciplinary reports that he has received (only three during almost 20 years of incarceration) were for nonviolent and relatively minor misconduct. Nothing in the record supports a conclusion that he poses a threat to public safety because he once engaged in the unauthorized use of a copy machine, once participated in a work strike, and once was found in possession of a fan stolen by his roommate. (Cf. *Lawrence, supra*, 44 Cal.4th at p. 1224.)

The only other factor cited by the Board is what it viewed as defendant's lack of insight into his behavior that led to the killing. Defendant asserts, and the People concede, that this factor was based on defendant's continued insistence that the killing was the unintentional result of an accidental shooting when he foolishly played with a gun he believed to be unloaded.

Noting he has expressed remorse for taking the victim's life, accepted "full responsibility" for the killing, and acknowledged he deserved to be incarcerated for his crime, defendant contends it is inappropriate for the Board to find him unsuitable for parole because he refuses to admit that he committed second degree murder rather than manslaughter.

■ The Board is precluded from conditioning a prisoner's parole on an admission of guilt. (Pen. Code, § 5011, subd. (b); Cal. Code Regs., tit. 15, § 2236.)[2] But the People contend that the Board's concerns about defendant's

---

[2] Penal Code section 5011 states: "(b) The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."

Section 2236 states: "The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability. *The board shall not require an admission of guilt to any crime for which the prisoner was committed.* A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner. Written material submitted by the prisoner under § 2249 relating to personal culpability shall be considered." (Italics added.)

insight were appropriate and were not an indirect requirement he admit he is guilty of second degree murder. (Citing *Shaputis, supra*, 44 Cal.4th 1241; *In re McClendon* (2003) 113 Cal.App.4th 315 [6 Cal.Rptr.3d 278] (hereafter *McClendon*); and *In re Van Houten* (2004) 116 Cal.App.4th 339 [10 Cal.Rptr.3d 406] (hereafter *Van Houten*).) We are not persuaded.

In *Shaputis*, the inability of the inmate "to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming,' " was some evidence of his dangerousness and unsuitability for parole (*Shaputis, supra*, 44 Cal.4th at p. 1260) because (1) his killing his wife "was the culmination of many years of [his] violent and brutalizing behavior toward the victim, his children, and his previous wife" (*id.* at p. 1259), (2) his continuing claim that the killing was unintentional was contrary to undisputed evidence that the gun he used "could not have been fired accidentally, because the hammer was required to be pulled back into a cocked position to enable the trigger to function, and the gun had a 'transfer bar' preventing accidental discharge" (*id.* at pp. 1248, 1260), and (3) his recent psychological reports reflected that his character, as shown by the killing and his "history of domestic abuse," "remain[ed] unchanged" at the time of the parole hearing (*id.* at p. 1260).

In *McClendon*, the inmate arrived around midnight at the home of his estranged wife; was wearing rubber gloves and carrying a loaded handgun, a wrench, and a bottle of industrial acid; "barged . . . into" the residence; aimed the gun at his wife and the man with whom she was sitting on the couch and talking; shot his wife in the head; and, when the gun jammed, struck the man two or three times in the head with the wrench. (*McClendon, supra*, 113 Cal.App.4th at pp. 319–320, 322.) The inmate claimed the shooting was unintended, and he showed no remorse for the killing and attack on the male victim. (*Id.* at p. 322.) Accordingly, his failure to accept complete responsibility for killing his estranged wife—instead claiming it was unplanned, despite overwhelming evidence that it was a calculated attack—was some evidence of his continuing dangerousness at the time of the parole hearing. (*Ibid.*)

In *Van Houten*, the inmate, a disciple of Charles Manson, "felt 'left out' [because she was not asked to take part in the brutal murders of Sharon Tate, Voitcek Frykowski, Abigail Folger, Jay Sebring, and Steven Parent] and wanted to be included next time." (*Van Houten, supra*, 116 Cal.App.4th at pp. 344–345.) Getting her wish, she participated in the fatal stabbings and "gratuitous mutilation" of two victims, and said that " 'she had stabbed a woman who was already dead, and that the more she did it the more fun it was.' " (*Id.* at pp. 346, 350–351.) Although she "did not contest the Board's version of events" (*id.* at p. 355, fn. 9), she minimized her culpability and "deflect[ed] responsibility for her actions on Manson." (*Id.* at p. 355.) In light

of the "egregious character of the offenses" and her "unstable social history," the inmate's "attitude" about the murders was some evidence she remained "an unstable person" in need of "continued therapy and programming" to obtain " 'further insight' " concerning her "vicious and evilly motivated" actions before it could be said that she no longer posed a risk to public safety. (*Id.* at pp. 353, 355–356.)

Here, in contrast to the situations in *Shaputis* and *McClendon*, defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And, unlike the defendants in *Van Houten*, *Shaputis*, and *McClendon*, defendant accepted "full responsibility" for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole. Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does *not* support the Board's finding that he remains a danger to public safety. (Cf. *Lawrence, supra*, 44 Cal.4th at p. 1224.)

██ In sum, defendant had no prior criminal history; the killing of the victim was not so calculated and evil as to indicate, without more, that he remains a continuing danger to the public 21 years later; he has expressed remorse and accepted full responsibility for the killing, albeit believing he is guilty only of manslaughter; during his 20 years of custody in prison, he received only three disciplinary writeups, all for nonviolent and relatively minor misconduct; he has effectively participated in rehabilitative programs; psychological evaluators opine he no longer represents a danger to public safety if released on parole; he has job skills and job offers if released; and he has a supportive family willing to ease his transition back into society. Applying the principles expressed in *Lawrence, supra*, 44 Cal.4th 1181, we are compelled to conclude that, in light of the nature of defendant's crime, the period of time that has elapsed since the crime, the affirmative evidence of his preconviction and postconviction conduct and his current mental state shown by his rehabilitative efforts and psychological evaluations, and his future prospects if granted parole, there is no evidence to support the Board's finding that he poses a danger to public safety if released on parole.

## DISPOSITION

The petition for writ of habeas corpus is granted because the evidence presented at the 2006 parole hearing does not support the Board's finding that defendant is unsuitable for parole. The Board is directed to hold a new

hearing within 30 days of the finality of this decision and to find defendant suitable for parole, unless *new evidence* of his conduct and/or change in mental state *subsequent to the 2006 parole hearing* is introduced and is sufficient to support a finding that he currently poses an unreasonable risk of danger to society if released on parole.

Robie, J., concurred.

**NICHOLSON, J.,** Dissenting.—I respectfully dissent. While this is a close case, there is "some evidence" upon which the Board of Parole Hearings (the Board) could rely to find that Darin Palermo is currently dangerous, including the aggravated facts of the murder and Palermo's continuing lack of insight concerning personal responsibility for his actions. In my opinion, the Board's denial of parole should be upheld.

*Standard of Review*

"[T]he relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [Citations.]" (*In re Lawrence* (2008) 44 Cal.4th 1181, 1221 [82 Cal.Rptr.3d 169, 190 P.3d 535].) "[T]he proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor." (*In re Shaputis* (2008) 44 Cal.4th 1241, 1254 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*).)

In *Shaputis*, the Supreme Court upheld the Governor's denial of parole. Though the Board ordered petitioner paroled to San Diego County, the Governor reversed that decision on two grounds: (1) the crime was especially aggravated as involving some premeditation and (2) the petitioner had not fully accepted responsibility for and lacked sufficient insight concerning .his conduct toward the victim. (*Shaputis, supra,* 44 Cal.4th at p. 1253.) The *Shaputis* court concluded that some evidence supported the Governor's decision that the petitioner remains dangerous. First, the record supported the Governor's determination the crime was "especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that petitioner poses a current risk to public safety." (*Id.* at p. 1259, original italics.) The record established "that although petitioner has stated that his conduct was 'wrong,' and feels some remorse for the crime, he has failed to gain insight or

understanding into either his violent conduct or his commission of the commitment offense. Evidence concerning the nature of the weapon, the location of ammunition found at the crime scene, and petitioner's statement that he had a 'little fight' with his wife support the view that he killed his wife intentionally, but as the record also demonstrates, petitioner *still* claims the shooting was an *accident*. This claim, considered with evidence of petitioner's history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming,' all provide some evidence in support of the Governor's conclusion that petitioner remains dangerous and is unsuitable for parole." (*Id.* at p. 1260, original italics, fns. omitted.)

Following *Shaputis*, I am of the view that the circumstances of the offense, combined with Palermo's lack of insight concerning his responsibility for the offense, provide "some evidence" of current dangerousness.

### Facts of the Underlying Offense

A closer look at the record reveals that this murder was not as accidental as Palermo, and the majority (which concludes that Palermo's version "was not physically impossible" (maj. opn., *ante*, at p. 1112)), would have us believe.

Before sentencing, Palermo moved to reduce the crime to voluntary manslaughter. In denying the motion, the trial judge, who had the benefit of sitting through the trial and observing the demeanor of the witnesses, summarized some of the evidence relevant to the jury's finding that Palermo committed second degree murder. That court stated:

"Among the evidence against the defendant, the most damaging evidence against him were [*sic*], one, the testimony of 10 year old Gregory Dukes, junior, who heard a woman scream approximately six seconds before the gunshot. [¶] . . . [¶]

"Number two, there were fresh abrasions to the victim's left knee which was consistent with the People's scenario that the victim was on the floor trying to evade the defendant when she was shot.

"Under the defendant's scenario, he had dry fired the weapon and then playfully pointed the weapon at [the victim], who was seated at the commode, [and] fired, thinking it was empty. Surprised it was not, and when learning that [the victim] was shot, [the victim] got up and staggered toward the defendant [*sic*]. The defendant then put his arms around [the victim] and slowly carried her over to the entry way.

"Under that scenario, there could be no way in which there would be a fresh abrasion on the left knee.

"Thirdly, the defendant's initial statement that [the victim] had accidentally shot herself.

"Number four, when the defendant was placed in the backseat of the police unit, he secreted, he hid the spent shell casing in the patrol car that was later found by the police.

"Five, there was a demonstration by the Department of Justice expert, Michael Giusto, of the manner in which you load and unload a Smith and Wesson revolver, .357 revolver. And in doing so, in front of the jury, when he unloaded the cylinder, all six shells dropped out.

"When the defendant was asked to stand before the jury to demonstrate how you did it on the day that [the victim] was killed, when he unloaded the cylinder, all six shells fell out."

It is apparent, therefore, that the trial judge did not believe Palermo's story because it conflicted with the evidence at trial.

The Board relied, in part, on the underlying offense in denying parole in the most recent hearing. It noted that the victim was vulnerable—in a small room and unarmed—and that she was caught by surprise. The evidence indicated that she was in a defensive posture, which is inconsistent with Palermo's version that they were laughing and joking.

### Facts Relating to Palermo's Lack of Insight

In spite of the evidence contradicting Palermo's story that the shooting was accidental, as noted by the trial judge, Palermo continued to maintain in his statement to the probation officer before sentencing that it was an accident and that he did not know the gun was loaded. He attempted to explain away his actions, to cover up the extent of his culpability. Concerning his statement that the victim had shot herself, he said: " '[M]aybe I said that because it was her that got shot.' "

At Palermo's sentencing, the victim's father addressed the court: "Generally, when . . . children do bad things, they are punished for it. I'm not going to go into a lot of details in this area, but, I still feel it needs to be said, [Palermo] was no different than anyone else when he was growing up. [¶] But every time he did something, somebody paid somebody off, somebody covered it up. Many things that was [sic] done was [sic] kept from the father.

My daughter told me dozens of things. [¶] Again, another thing I found out while I was in the courtroom, anything my daughter told me is hearsay, so you can't believe anything she told me. But still, [Palermo] probably never, ever, paid for anything he ever did."[1]

At Palermo's first parole hearing, in 1997, Palermo claimed that, when he pointed the gun at the victim, both he and she were laughing. She was sitting on the toilet. According to Palermo, the victim had no other reaction to his, pointing the gun at her. After he shot her, she stood up and walked toward him. This view is inconsistent with the evidence at trial, as noted by the trial judge, that she screamed, went down to the floor, and was in a defensive posture when she was shot.

The victim's brother spoke at the first parole hearing. He said: "We personally feel that it was a cover up from the very beginning and we feel that it is now. We feel that he has not accepted full responsibility for the facts as they were brought up in the trial and as he was convicted by his peers. And to this day I think I can speak clearly for these folks, we are still appalled that he hasn't fully accepted responsibilities [sic] for those specific facts."

In the Board's first decision, in 1997, it found that Palermo was deficient in his efforts to obtain "sufficient beneficial self-help and therapy programming. . . . [T]he prisoner is in need of therapy in order to face, discuss and come to grips with the underlying causes of the commitment offense. *Until progress is made, he continues to be unpredictable.*" (Italics added.) The Board informed Palermo that he would need "sufficient participation in self-help and therapy programming, specifically something to help him develop insight and come to grips with his actions in the commitment offense."

Again, in 2002, the Board cited Palermo's failure to obtain sufficient self-help and therapy programming. The Board encouraged Palermo to get help to "better understand the causative factors, better . . . understand the reasoning behind why you're here for this instant offense today."

In the 2006 parole hearing, the one under review in this proceeding, Palermo decided not to discuss the underlying offense. Concerning disciplinary action taken against him for possessing a stolen fan, Palermo attempted to minimize his involvement and culpability. He said: "That was—that was my cellee. He was stealing that. It wasn't part of anything that I—I had my own

---

[1] Penal Code section 3043, subdivision (d) requires the Board to consider statements of next of kin. Although the statements noted above were made during sentencing, they were part of the record considered by the Board.

fan and there was a little confusion about writing up—they write up both cellees up [*sic*]. And they found us both guilty." After the commissioner reminded Palermo that another inmate had given the fan to Palermo and Palermo had passed it along to his cellmate, Palermo responded: "Right. He was right behind me. The prisoner handed to me a bag. And it had the fan, and I handed it over to him." Palermo continued to protest, however, that he was not guilty. Despite the Board's earlier findings and admonitions concerning his lack of insight, Palermo admitted that he is weak on self-help and therapy.[2]

The Board found Palermo unsuitable for parole because he "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." In making this determination, the Board relied on the commitment offense, his disciplinary history in prison, and his lack of insight.

Concerning the commitment offense, the Board stated: "This was the murder of Andrea Naftel. She was 22 years old according to the information that I have in the record at the time of the offense. And certainly was a situation where she was vulnerable. She was . . . in a small room—she was unarmed. And apparently was somewhat—it seems from looking at the information that we have in the probation officer's report somewhat caught by surprise. There's a lot of information about the physical evidence on both sides, both for the defense and the prosecution, but there is some evidence to indicate that she was looking at the gun, that she was standing, and had her arm in a position over her face or her head, which is certainly different than what Mr. Palermo has said happened at the time. Either way. This was a situation where there had been a prior relationship, and as I said this was a young woman who was in quite a vulnerable position and certainly was unable to defend herself at the time."

Concerning the disciplinary problems in prison, the Board stated: "[W]hile overall he has only had two 115s, the most recent one was in '02 and that was shortly after his last hearing. He also has . . . received a 128 counseling Chrono since his last hearing."

Concerning Palermo's lack of insight, the Board stated: "I'm not entirely sure how much insight you have into your own behavior, but I encourage you to continue to work in the area of self-help to continue to build insight."

---

[2] *Counsel for Palermo would have us conclude that, because of his difficulties in hearing,* Palermo did not understand the commissioner's comment about being weak in self-help. We are not allowed, however, to interpret the record in this manner. In response to the commissioner's statement, "You know you're weak in the area of self-help and therapy programs," Palermo responded, "Yeah. I try—there were several of them—I signed up for it, and I'm still waiting to get in."

The record reflects that Palermo took self-help and therapy classes, but that does not mean that he has successfully addressed his lack of insight. A grant of parole is not based on going through the motions; instead, it is based on successfully addressing a prisoner's specific problems that make him dangerous. Here, Palermo still fails to come to grips with his culpability in murdering the victim.

*Majority Opinion*

I disagree with the majority concerning whether there is some evidence to support the Board's decision that Palermo is currently dangerous. In my view, the majority simply reweighs the evidence and finds in favor of Palermo. Reweighing, however, is not our role. Also, the majority adopts Palermo's version of the murder, a version with which the trial judge expressly disagreed during the posttrial proceedings.

According to the majority, Palermo's insistence that the shooting was an accident must be accepted because his "version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational." (Maj. opn., *ante*, at p. 1112.) The majority also states that Palermo "accepted 'full responsibility' for his crime and expressed complete remorse . . . . Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does *not* support the Board's finding that he remains a danger to public safety." (Maj. opn., *ante*, at p. 1112, original italics, citing *Lawrence*.)

I do not believe we can or should so blithely disregard the trial court's findings. It found that Palermo's story that he and the victim were laughing and joking when he pointed the gun at her was contrary to the evidence. The facts showed her screaming, falling to the floor, and being shot while in a defensive posture. Palermo knew how to empty the bullets out of the gun, as he demonstrated at trial, and he was very careful about gun safety. Unlike the majority, I do not feel "compelled" to conclude that "there is no evidence to support the Board's finding that he poses a danger to public safety if released on parole." (Maj. opn., *ante*, at p. 1112.)

Here, as in *Shaputis*, the record shows an aggravated murder and Palermo's failure to develop insight into his responsibility for the murder. Concededly, unlike the petitioner in *Shaputis*, Palermo did not have a prior criminal record or years of abusive behavior. But also unlike the *Shaputis* petitioner, Palermo has had disciplinary problems in prison. Those problems tend not to be severe; however, they show Palermo's inability to come to grips with his responsibility for his own actions. For example, in his comments to the Board, he

minimized his own responsibility for passing along stolen property. Palermo's failure to understand his full culpability for the murder and his continuing lack of insight in this regard, under *Shaputis*, provides some evidence to support the Board's decision.

### Conclusion

Palermo lacks insight into his responsibility for his crime and later problems. He denies that the murder was not an accident, even in the face of the contrary evidence. He denies culpability for the wrongdoing for which he received discipline in prison. It just never seems to be his fault. The Board cited Palermo's lack of insight, and I believe this is some evidence to support the decision.

The majority looks at each incident concerning Palermo's lack of insight and paints it as inconsequential. But that is not our role. Our role is to determine whether there was some evidence to support the Board's decision—its determination that Palermo is dangerous because of the facts of the crime and his continuing lack of insight. Under that standard, we should affirm.