[No. G046142. Fourth Dist., Div. Three. June 25, 2012.]

In re ALEX TAPIA on Habeas Corpus.

COUNSEL

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Julie A. Malone and Christopher J. Rench, Deputy Attorneys General, for Appellant State of California.

Frank Ospino, Public Defender, Jean Wilkinson, Chief Deputy Public Defender, Mark Brown, Assistant Public Defender, and Christine McDonald, Deputy Public Defender, for Respondent Alex Tapia.

OPINION

FYBEL, J.—

INTRODUCTION

Alex Tapia was convicted of first degree attempted murder, conspiracy to commit murder, and kidnapping, and was sentenced to 26 years to life, with the possibility of parole. After serving more than 15 years in prison, Tapia appeared before the Board of Parole Hearings (the Board) for his first parole hearing. The Board concluded that Tapia was not suitable for parole because he posed an unreasonable risk of danger to public safety. Tapia filed a petition for a writ of habeas corpus, which the trial court granted.

Under the relevant legal standards for reviewing the Board's decisions, we conclude there was some evidence supporting the Board's decision that Tapia was not suitable for parole, and we therefore reverse the trial court's order.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 1993, Tapia attempted to kill Salvador Vega. Vega paid $3,300 to repair a motorcycle Tapia had damaged; two or three months before the crime, Vega had begun demanding that Tapia pay him back. Two weeks before the crime, Tapia discussed killing Vega with a friend, identified only by his moniker, "Psycho." Two days before the crime, Tapia decided to murder Vega.

On the day of the crime, Tapia borrowed Vega's car and drove him to work. Tapia and Psycho picked up Vega after work, and told Vega to drive to a location where Tapia would obtain the money he owed. Tapia was seated in the backseat, directly behind Vega, who was in the driver's seat; Psycho was seated in the front passenger seat. When Vega parked the car, Tapia slipped a jump rope around Vega's neck and strangled him, while Psycho stabbed him multiple times. When Vega lost consciousness, Tapia and Psycho thought he was dead, placed his body in the trunk of the car, and then drove away. Vega regained consciousness, pried open the trunk, and escaped.

Tapia fled to Mexico. He returned to California eight months later and surrendered himself to police. Tapia was convicted of first degree attempted murder with personal use of a deadly weapon, conspiracy to commit murder, and kidnapping. He was sentenced to 26 years to life in prison, with the possibility of parole.

In November 2010, after more than 15 years in prison, Tapia appeared for his first parole-suitability hearing before the Board. The Board considered the findings of an April 2010 psychological evaluation of Tapia, performed by forensic psychologist Dr. K. Kropf. The evaluation noted that Tapia had accepted responsibility for the crime and acknowledged that it was wrong and a cowardly act; Tapia agreed that his sentence was appropriate and he "deserve[d] everything I received." Dr. Kropf opined that Tapia's remorse for the crime was genuine, and found Tapia was able to articulate the effect his criminal acts had on Vega and others. With respect to Tapia's insight into what had caused him to commit the crime, Dr. Kropf noted: "Mr. Tapia seems to have developed insight into the more prominent factors that contributed to his commission of his life crime. He stated that he had poor communication and coping skills. He also indicated that his substance abuse was causing him to 'shut down' and experience 'pressure' at school, interpersonally, and at home. . . . His insight notwithstanding, his choice to withhold information regarding the identity of his co-offender suggests that his commitment to that

individual exceeds his commitment to the community." Dr. Kropf concluded, "[a]fter weighing all of the data from the available records, the clinical interview, and the risk assessment data, it is opined that Mr. Tapia's risk for violence in the free community falls in the low range."

Tapia had a single disciplinary action while in prison, for possessing inmate-manufactured alcohol in January 1999; he had remained free from discipline since then. While incarcerated, Tapia obtained his general equivalency diploma, an associate of arts degree in liberal arts, and a paralegal certificate. He earned vocational certificates in several different areas, and took advantage of self-help programs such as Alcoholics Anonymous, a parenting class, anger management classes, stress management classes, and job training. Tapia also volunteered as a tutor in a literacy program and as a mentor to other inmates regarding substance abuse and anger management.

Tapia had viable plans for parole, both in the United States and Mexico.

The Board concluded Tapia was not suitable for parole because he had not taken full responsibility for his crime, and therefore posed an unreasonable risk of danger to public safety. The factors on which the Board relied were Tapia's downplaying of the planning elements of the crime, and his failure to disclose Psycho's identity before the parole-suitability hearing.[1] The Board determined that Tapia required at least three more years of incarceration before his next parole hearing.

Tapia filed a petition for a writ of habeas corpus challenging the Board's denial of parole. The trial court issued an order to show cause; the Attorney General filed a return, and Tapia filed a traverse. Without conducting an evidentiary hearing, the trial court issued an order granting the petition for a writ of habeas corpus. The Attorney General timely appealed. This court granted the Attorney General's petition for a writ of supersedeas, staying the trial court's order that the Board conduct a new parole hearing within 120 days.

RELEVANT LAW

The Board is charged with determining whether a prisoner sentenced to life with the possibility of parole is suitable for release. (Pen. Code, § 3041; Cal. Code Regs., tit. 15, § 2402.) The Board normally sets a date for release after the parole hearing "unless it determines that the gravity of the

---

[1] The Board also relied on Tapia's minimization of his involvement with a gang before the attack on Vega. The trial court found Tapia's denial of gang membership or association was not probative of his current dangerousness. On appeal, the Attorney General does not rely on Tapia's denial of gang membership or association, and we will not further address this factor.

current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting. . . ." (Pen. Code, § 3041, subd. (b).)

"[W]hen a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings. [Citations.]" (*In re Lawrence* (2008) 44 Cal.4th 1181, 1212 [82 Cal.Rptr.3d 169, 190 P.3d 535].) "When reviewing a parole unsuitability determination by the Board or the Governor, a court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole." (*In re Shaputis* (2011) 53 Cal.4th 192, 214 [134 Cal.Rptr.3d 86, 265 P.3d 253].)

"Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor [or the Board]. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor [or the Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's [or the Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's [or the Board's] decision." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [128 Cal.Rptr.2d 104, 59 P.3d 174].)

■ "In sum, the Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety [citations], and our discussion in both *Rosenkrantz* and [*In re*] *Dannenberg* [(2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783]] emphasized this point. Moreover, it is apparent from the foregoing discussion that the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness. As noted above, a parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting 'whether the inmate

will be able to live in society without committing additional antisocial acts.' [Citation.] These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate. [Citations.]" (*In re Lawrence, supra*, 44 Cal.4th at pp. 1205–1206.)

Most recently, the Supreme Court summarized the key considerations for courts reviewing parole-suitability determinations by the Board: "1. The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety. [¶] 2. That question is posed first to the Board and then to the Governor, who draw their answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior. [¶] . . . [¶] 4. Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision. [¶] 5. The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*In re Shaputis, supra*, 53 Cal.4th at pp. 220–221.)

"When a superior court grants relief on a petition for habeas corpus without an evidentiary hearing, . . . the question presented on appeal is a question of law, which the appellate court reviews de novo." (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1192 [92 Cal.Rptr.3d 36].)

### Discussion

Is there a rational nexus between the evidence and the Board's determination that Tapia was unsuitable for parole because his failure to take full responsibility for the crime made him an unreasonable threat to public safety? Having reviewed the entire record, we conclude the answer to this question is yes.

Tapia disclosed the identity of his coconspirator, previously known only as "Psycho," at the parole hearing.[2] The Board found the failure to disclose Psycho's identity until that date was evidence of Tapia's unsuitability for

---

[2] In their respective briefs, the parties argue whether Tapia intentionally concealed Psycho's true identity, or whether the failure to identify him was the result of Tapia's assertion of his Fifth Amendment privilege against self-incrimination, coupled with law enforcement's failure to ask about Psycho's identity after Tapia's conviction. We need not decide which version of the story

parole. "You did give the name today of your crime partner to the District Attorney, however, it is still not clear to this Panel why you chose today. We think it's important that you came forward. We certainly do. But the one thing that we did notice, Mr. Tapia, you're not an ignorant person. You're intelligent. And whether or not it was, in my terms here, reading the tea leaves, looking at the psychological report, taking into account what the psychologist told you as to you[r] unwillingness to disclose your crime partner, the fact of the matter is you came forward today, and you are to be commended for that. But the thing that's troubling about that is that you have been incarcerated for a number of years. And with the violent nature of the commitment offense, to have an individual who took it upon himself after you and he planned to kill Mr. Vega still walking around in our communities and the risk that you put the community at is really troubling to this Panel. It demonstrates again that, at least to this Panel, you say you're taking full responsibility, but by not disclosing your crime partner in an attempt to protect society from a further act of violence, you're really not taking responsibility for your actions."

■ Tapia's failure to identify Psycho until the day of the parole hearing permitted Psycho to remain free from punishment for his part in the attack on Vega for at least 17 years, might have allowed a dangerous criminal to remain on the streets as a threat to public safety, and neglected Tapia's societal obligation to protect the public by reporting criminal activity. (See, e.g., *Roberts v. United States* (1980) 445 U.S. 552, 558 [63 L.Ed.2d 622, 100 S.Ct. 1358] ["gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship"].)[3] As Dr. Kropf noted in the evaluation of Tapia for the parole hearing, Tapia's "choice to withhold information regarding the identity of his co-offender suggests that his commitment to that individual exceeds his commitment to the community." Tapia's lack of commitment to the community was a factor the Board could appropriately consider in determining whether Tapia was suitable for parole.

■ Tapia relies on *In re Elkins* (2006) 144 Cal.App.4th 475, 495 [50 Cal.Rptr.3d 503], for the proposition that the acceptance of responsibility for the crime, no matter how recent, works in favor of release on parole. Whether *In re Elkins* can be read to apply to acceptance of full responsibility made on the day of, and in fact during a break in, the parole hearing is not a decision we need to make. In that case, the defendant had accepted full responsibility

---

is correct. The undisputed fact is that Tapia first disclosed Psycho's identity on the day of the parole hearing. For purposes of our analysis, nothing more is required.

[3] Tapia correctly notes that the social obligation to report criminal activity does not trump the privilege against self-incrimination. (*Roberts v. United States, supra,* 445 U.S. at p. 558.) Tapia's privilege, however, did not extend past the time "sentence ha[d] been fixed and the judgment of conviction ha[d] become final." (*Mitchell v. United States* (1999) 526 U.S. 314, 326 [143 L.Ed.2d 424, 119 S.Ct. 1307].)

for the crime more than a decade before the parole hearing. (*Ibid.*) This case differs because Tapia did not simply have a late acceptance of full responsibility; he was late in providing the identity of his coconspirator in an attempted murder. Failing to provide the identity of a violent criminal for 17 years after the crime is committed constitutes an ongoing threat to public safety throughout that time period, and is some evidence of Tapia's unsuitability for parole.

 There was also some evidence of Tapia's downplaying of the planning elements of the crime, justifying the Board's conclusion that Tapia was unsuitable for parole. An inmate's downplaying or minimizing aspects of the commitment offense reflects a denial of responsibility, and is probative of current dangerousness. (*In re Shippman* (2010) 185 Cal.App.4th 446, 461 [110 Cal.Rptr.3d 326] [the defendant's "repeated denials or downplaying [of his controlling nature toward women, which resulted in violence,] support an inference that he remains a threat to public safety"].)

In *In re McClendon* (2003) 113 Cal.App.4th 315, 321–322 [6 Cal.Rptr.3d 278], the court concluded there was some evidence supporting the Governor's denial of parole based on the defendant's failure to accept full responsibility for his crime, despite the defendant's admission he killed his wife. "Petitioner wore rubber gloves when he barged uninvited into his wife's home, wielding a gun and wrench that he used to kill his wife and bludgeon her companion. Petitioner maintains that he simply wanted to show his new gun to his estranged wife, and that the gloves, wrench, and industrial acid were brought for household chores. Petitioner's explanations may be true, and he certainly cannot be compelled to admit premeditation. However, there is at least some evidence that petitioner has not fully accepted responsibility for his actions in precipitating a deadly attack, even if his purpose in bringing a loaded gun with him was innocent. [¶] Similarly, the Governor was free to regard petitioner's characterization of Bynum's [(the companion's)] injuries as 'some scrapes, cuts, abrasions,' as a demonstration that petitioner fails to apprehend the magnitude of his crime. Petitioner elsewhere concedes that he 'probably would have tried' to shoot Bynum if petitioner's gun had not jammed, and does not deny that he struck Bynum in the head with the wrench two or three times. Bynum and the apartment wall were blood splattered when the police arrived. Despite these facts, and petitioner's acknowledgement of them, he still minimized Bynum's injuries when testifying before the Board. Petitioner's dismissal of Bynum's injuries as 'some scrapes, cuts, abrasions,' is 'some evidence' that petitioner does not understand the magnitude of his offense." (*Id.* at p. 322.)

Here, Tapia told the Board he had decided to kill Vega, but had not developed a plan or taken steps to coordinate with Psycho as to how the murder would occur. In contrast, the Board had before it evidence that Tapia considered killing Vega 12 days before, and actually made the decision to kill him two days before, the crime was committed. Tapia convinced Vega to drive his own car to a deserted parking lot; Tapia seated himself behind Vega rather than driving the car himself. Tapia and Psycho had planned the attack well enough that Psycho stabbed Vega while Vega was being strangled by Tapia. The probation report prepared for Tapia's sentencing hearing found that "[t]he manner in which the crime was carried out indicates planning," the crime "was premeditated and planned," and the circumstances of the crime "impl[y] the defendant was in a position of leadership as far as this offense is concerned."

The Board found Tapia's statements at the parole hearing not to be credible: "[T]his Panel really finds that hard to believe with respect to—[i]f you've taken the steps to solicit and enlist the help of [Psycho], you've made the decision that you're going to kill somebody. And then to sit here before this Panel and say that you really didn't have a plan really seems a little bit disingenuous, which again would demonstrate to this Panel that you really haven't explored the nature and magnitude of the offense or explored the causative factors for why you committed the . . . attempted murder of Mr. Vega, which again would demonstrate to this Panel that you would currently pose an unreasonable risk to public safety."

*In re Palermo* (2009) 171 Cal.App.4th 1096 [90 Cal.Rptr.3d 101], cited by Tapia, does not compel a different result. In that case, the Court of Appeal held the defendant's continued insistence that the killing of his girlfriend was unintentional, despite accepting responsibility for the crime, did not support the Board's finding that he remained a danger to public safety. (*Id.* at p. 1112.) "[D]efendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational." (*Ibid.*) Tapia contends his version of the attack on Vega—that he had decided to kill Vega but had otherwise not made any plans as to how to accomplish the killing— was not physically impossible and did not strain credulity. The rule of *In re Palermo* has been called into question by the Supreme Court's decision in *In re Shaputis, supra,* 53 Cal.4th at pages 214–215, in which the court held the record must be viewed in the light most favorable to the Board's decision, and that when "the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary." The Board's decision in this case does not lack any rational basis, and is not merely arbitrary.

## DISPOSITION

The order granting the petition for a writ of habeas corpus is reversed. The matter is remanded with directions to the trial court to enter an order denying the petition for a writ of habeas corpus. Upon such denial, the stay imposed by this court's order granting the Attorney General's petition for a writ of supersedeas shall be lifted.

Aronson, Acting P. J., and Ikola, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 17, 2012, S204540.