[No. C068098. Third Dist. Aug. 2, 2012.]

In re BRIAN MONTGOMERY on Habeas Corpus.

150

COUNSEL

Reeves & Lynch and Monica Lynch for Petitioner Brian Montgomery.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien and Krista L. Pollard, Deputy Attorneys General, for Respondent The People.

OPINION

DUARTE, J.—The Warden of California State Prison, Solano (the State) appeals the trial court's order granting Brian Montgomery's petition for writ of habeas corpus. The trial court held the September 2009 decision by the Board of Parole Hearings (the Board) issuing a three-year denial of Montgomery's parole was *not* supported by some evidence, and accordingly remanded to the Board for a new suitability hearing.

As we will explain, applying the most recent guidance provided by our Supreme Court on this issue, we conclude that there was indeed some evidence supporting the Board's finding of current dangerousness. Accordingly, we shall reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

*Life Offense*

In the early evening of December 4, 1990, El Dorado County Sheriff's Deputy Robert Pepper attempted to stop Montgomery for speeding. Montgomery had been attempting to manufacture methamphetamine and had a propane stove, a box of glassware and a large bag of "unfinished" methamphetamine in his car. He also had outstanding arrest warrants and was on probation. Montgomery had previously told a friend there were outstanding warrants for his arrest and he did not want to "run into any cops because he didn't want to be arrested again and go back to jail." Upon seeing Deputy Pepper's lights, rather than immediately stopping, Montgomery slowed to about 20 miles per hour, entered a store parking lot, slowed to five miles per hour, drove onto an adjoining street, continued about 100 feet, turned into another parking lot, drove 75 feet and then stopped.

Deputy Pepper approached the car and shined his flashlight throughout, concluding that Montgomery was alone in the car. He then asked Montgomery to put his hands on the steering wheel. Montgomery's right arm moved;

Pepper saw a faint muzzle flash and "heard eight or nine reports of a .22 semi-automatic long rifle coming in split-second succession" from the vehicle. Montgomery fled the scene.

Deputy Pepper, who had been wearing a bulletproof vest, suffered nine bullet wounds to the chest, shoulder, side, abdomen and back. Two of the bullets were stopped by the strike plate of the bulletproof vest and one was stopped by his "badge holder wallet" in his shirt pocket. Critically injured, he was life-flighted to Sacramento Medical Center where he underwent major surgery.

After leaving the scene, Montgomery called a friend and told her that he had shot someone. Montgomery also told the friend he had methamphetamine and equipment to make methamphetamine in his car. He hid the car and the gun used to shoot Deputy Pepper. Defendant told other friends there was a passenger in the car, "Tex",[1] who had shot a police officer. He claimed he did not know where the rifle came from, or what had happened to it, to Tex, or to the methamphetamine.

The next morning, Montgomery was arrested. He was found in possession of 30 rounds of live .22-caliber ammunition, a plastic bindle of white powder and a piece of laboratory glassware. Montgomery's car was found abandoned near a dirt road in a densely wooded area a mile or two away from the scene. The car contained three expended .22-caliber shells, a Freon refrigerant can, an empty .22-caliber ammunition box, and various substances and glassware associated with manufacturing methamphetamine. Montgomery's fingerprints were found throughout the car. Montgomery told police he and Tex had been together; when Montgomery saw the officer's red lights he became frightened because he had outstanding warrants. He claimed Tex told him not to worry about it and when the officer approached, Tex grabbed defendant's rifle and began shooting. He denied owning the glassware, but admitted using methamphetamine the day of the offense. While in jail, Montgomery showed a visitor a map indicating where the gun was hidden and asked her to pick it up and keep it at her home. Police found the gun used at the location indicated on the map.

Montgomery was convicted of attempted first degree murder, assault on a peace officer with a semiautomatic weapon and assault on a peace officer with a firearm. As to each count it was also found true that Montgomery had intentionally inflicted great bodily injury and personally used a firearm. As to

[1] "Tex" was apparently later identified as Derrick "Tex" Readance, but only defendant's self-serving statements linked Tex to Pepper's shooting. Tex's fingerprints were not found in the car Montgomery was driving at the time of the shooting; further, Tex testified for the prosecution at trial.

the attempted murder it was found true that in the commission of that offense, he injured another by discharging a firearm from a motor vehicle. He was sentenced to life in prison with the possibility of parole.

*Parole Plans*

Upon release, Montgomery had available residences in both Placerville and Redwood City. His preference was to move away from the Placerville area, as Deputy Pepper still lived there. In both cities, Montgomery had employment prospects with either a masonry contractor or a communications contractor. He had also developed a substance abuse relapse prevention plan, including information about local meetings and sponsors in both cities.

*Criminal and Social History*

Montgomery's past criminal history included multiple convictions. He had a juvenile adjudication for burglary in 1983. In 1986, he was convicted of possessing a switchblade knife, in 1988, of possessing methamphetamine, in 1989 for burglary and possessing controlled substance paraphernalia, and in 1990 for battery. These convictions resulted in multiple grants of diversion and probation. He also had a number of failures to appear and probation violations. He was on probation at the time he committed the life offense.

Montgomery had a "good" relationship with his divorced parents. Nonetheless, because he did not get along with his mother's boyfriend, he quit school after finishing 10th grade "to find different living arrangements." Montgomery described his childhood as lonely.

He started drinking at age 17 and would drink to the point of passing out or throwing up. He smoked marijuana "once in a while" and used PCP and cocaine "less than once per month." He first used methamphetamine at 19 years of age, and continued "heavy methamphetamine use" until arrested for his life offense. When he did not use methamphetamine, he "could not think straight" and would regularly not show up for work. He knew his heavy drug use "resulted in paranoid ideas and suspicion, but he continued to use." He acknowledged that most of his criminal offenses were committed as a result of his drug use.

*Institutional Programming, Education and Vocational Training*

While in prison, Montgomery completed a variety of vocational training programs, including landscaping, masonry and lens lab. He worked in the laundry and yard crew. Since 2000, he had worked in the lens lab. His supervisor's work reports reflected above-average performance. Montgomery

participated in a variety of self-help programming, including tobacco cessation, anger management, violence prevention, stress management, computer literacy, offense prevention, domestic violence, parenting classes, and emotional awareness. Montgomery also participated in Alcoholics Anonymous (AA) from 1995 to 1996 and the third quarter of 2005. He then participated in substance abuse programming on an informal basis. In 2009, he began attending a formal AA and Narcotics Anonymous (NA) program.

### Disciplinary Record

Montgomery received a "128"[2] in 1993 for not tucking in his shirt and one in 1994 for failing to respond to a breakfast call.

In February 2007, Montgomery received a "115"[3] for possession of tobacco. Montgomery had smoked cigarettes for about 10 years, but had since quit. Montgomery explained that another inmate, Jeff, claimed he had quit smoking about four or five days before the incident, but he continued to borrow money[4] from Montgomery to buy individual cigarettes. Montgomery rolled the cigarettes as a joke to try to tempt Jeff and to see if he had really quit smoking. Montgomery claimed the cigarettes did not actually contain tobacco, but paper made to look like tobacco. The cigarettes were thrown away before they could be tested to determine if they contained paper or tobacco.

### Psychological Evaluations

In his 2003 psychological evaluation, Montgomery explained to Dr. Van Couvering that he was high on drugs at the time of his life offense. He said he was stopped by an officer who discovered drug paraphernalia in the car and Montgomery shot him. "About the crime, [Montgomery] said, 'I feel like a complete idiot. I was praying one day I could apologize.'" Dr. Van Couvering concluded Montgomery's risk of future violence depended "upon his access to, and use of, drugs. . . . According to [Montgomery], this was drug-related. Unless [he] can somehow be kept free of drugs in the community his estimated future violence is high."

---

[2] A "128" is a "Custodial Counseling Chrono. When similar minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128-A, Custodial Counseling Chrono." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2).)

[3] A "115" is a "Rules Violation Report. When misconduct is believed to be a violation of law or is not minor in nature, it shall be reported on a CDC Form 115 . . . ." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

[4] Jeff did not borrow cash, but rather canteen ducats which could be used to purchase tobacco. The Board noted that borrowing and loaning ducats is a rules violation, although Montgomery was not specifically cited for this conduct. (See Cal. Code Regs., tit. 15, § 3192.)

In his 2004 psychological evaluation, in relation to the life offense, Montgomery told Dr. Davis that he was "coming down" from abusing drugs and was very paranoid and "delusional." When he was pulled over with a stove and rifle in his car, he was so paranoid that he was going to be shot, he picked up his rifle and shot Deputy Pepper five times. At the time of the offense, he was a criminal with no respect for the law or police officers. Dr. Davis noted Montgomery had a parole plan and had coped well with prison life. Accordingly, Dr. Davis concluded Montgomery had resolved the issues which led to the life crime and had a low potential for violence if released.

In his 2007 psychological assessment by Dr. Rouse, Montgomery "accepted culpability for his life crime." He acknowledged that earlier he had made excuses, but had come to the conclusion he was responsible for the shooting. "I pulled the trigger. I shot the deputy. I never had any good experience with law enforcement. I watched them beat on my uncles, my dad. I had no trust or faith in law enforcement. I was full of drugs. I truly believed that officer was going to shoot me if I didn't shoot him first. If I hadn't been on drugs, speeding, I never would have been in that mess. . . . If I hadn'a [sic] been using drugs, it never would have happened. I know that's no excuse. There is not relevancy of how I was thinking. It was my own stupidity . . . I nearly took a man's life for no reason at all, my own paranoia, my own demented belief. I know the situation will never happen again."

Dr. Rouse opined that Montgomery appeared to have "developed adequate and appropriate insight and understanding into the . . . factors which were causative as major contributors to his life crime. As a result, there is a high reasonable probability that Mr. Montgomery's current risk of dangerousness is low for this prison population and, if he continues to remain free of the temptations of drugs or alcohol, his risk in the free society would be average for those inmates who have committed similar offenses and had successful paroles in the community."

In his most recent psychological evaluation in October 2008, Montgomery explained to Dr. Parsons that at the time of the shooting he was paranoid and nervous because he had been awake for a long time due to his methamphetamine use. He had a cynical and resentful attitude toward law enforcement, believing it was corrupt. When he saw the deputy's flashing lights, he believed the deputy would kill him. "I figured I would do it first and when he walked [up to the vehicle] I fired."

Montgomery claimed that he had tried to manufacture methamphetamine on the day of the shooting, but had failed and was returning the glassware to the person who supplied it. He also claimed to have obtained the rifle about a

week and a half prior to the life offense as part of a drug deal. The rifle was in the car because he had taken it to his uncle to be cleaned. "He believed the crime was entirely his fault because he chose to use drugs." To make amends for the crime, "he has 'done everything possible since I've been in prison to do the time to the best of my ability. I tried to make up for what I've done by working so hard and doing good time.' "

Dr. Parsons concluded that Montgomery was a low-moderate risk to become involved in a violent offense if released. The assessment was based, in part, on the likelihood of continued abstinence from substance abuse. Dr. Parsons noted Montgomery's recent 115 for "possession of tobacco indicates that he may resist following rules of probation when it comes to substances that are forbidden for him to use but are not necessarily illegal in the community at large." She observed Montgomery could lower his risk level to "low" by creating a detailed substance abuse relapse prevention plan, identifying a family counseling program to help him and his family make adjustments upon his release, participating in AA/NA meetings and identifying potential sponsors.

Dr. Parsons expressed concern that Montgomery "must attain a reliable level of understanding related to his vulnerability to dependent substances and his need for [a] significant level of ongoing substance abuse treatment." She also opined that Montgomery would "be confronted with triggers to use amphetamine and alcohol in the community and in this evaluator's opinion, he has not yet adequately prepared for these destabilizing triggers." Accordingly, Dr. Parsons noted it would be helpful for Montgomery to "conduct an in-depth reassessment and inventory of his progress towards sobriety and identify triggers to use methamphetamine that may derail him." Montgomery's risk of reoffending would increase if, among other things, he returned to using intoxicating substances.

Dr. Parsons also specifically addressed the 115 for possession of tobacco. She noted Montgomery was diagnosed with amphetamine dependence and that Montgomery's vulnerability to relapse could lead to future violence; "however, possession of tobacco alone does not indicate a connection to future violent behavior." She noted that while "tobacco does not cause the disinhibiting effects of alcohol, in Mr. Montgomery's case, his failure to abide by the prohibition of tobacco . . . indicates that he did not follow the rules around contraband substances. This infraction indicates that Mr. Montgomery was willing to break the rules that are forbidden to him due to his life circumstances." However, she concluded Montgomery had not "demonstrated an ongoing pattern for the disregard for the rules and regulations of the institution, which would lead to [the] conclusion that he is at risk for imminent recidivism to violent behavior." Thus according to Dr. Parsons,

only *ongoing* disregard for the rules prohibiting possession of tobacco, or other contraband, would lead to the conclusion that Montgomery was a risk for having difficulty following the terms and conditions of parole. Dr. Parsons did not have access to the form addressing Montgomery's explanation of the 115, and therefore his explanation was not discussed.

### Life Prisoner Evaluation Report

In August 2009, as part of the life prisoner evaluation, Montgomery stated at the time of the shooting it had not "mentally registered in any way that I was shooting at a human being. My perception of law enforcement was negative. I never had an experience with a lawman that wasn't dehumanizing. After each confrontation, my opinion grew more factual. . . . I was convinced law enforcement thought they were gods, superiors to the human race. In my reality they were all hypocrites, just as, if not more[,] corrupt than myself or anyone else . . . . [Those perceptions of law enforcement], an inferiority complex within myself, the extended use of methamphetamines enhanced the intensity of my actions . . . . I was paranoid of irrelevant things . . . . [I] was never in tune with reality . . . . I'm not trying to use the fact that I was and had been on drugs at the time of my crime, as any kind of excuse for my actions. The drugs did not choose to take me, I chose to take them; leaving all that happened, my fault." In attempting to recall the shooting, he claimed when he saw the flash of red lights, he thought he was going to be killed. When he saw the officer near the driver's side door, his "mind instantly concluded it was life or death for me and I wanted to live. On top of everything else, I already knew my reasons for having glassware and a rifle in the car would never be heard . . . . I was shooting in fear and not [at] a human being. Law enforcement and their ways of treating people contradicted their purpose. Afterwards, I took off without the exact realization of what just occurred." He indicated his views about law enforcement had changed during his incarceration. "I've grown, matured and come along [*sic*] way since I was arrested. The boy who committed the crime no longer exists."

### September 2009 Hearing

In response to questioning from the Board at the hearing, defendant stated he did not blame drugs for the offense. He blamed himself, because he was the one who took the drugs. He stated he was different now than at the time of the commitment offense, because he had matured significantly. While in prison, he had grown, learned and accomplished a lot and become a very responsible adult. He credited NA, AA and anger management as among the most beneficial of his accomplishments and stated he wanted to give back by helping others address their addiction problems. Specifically, he noted his

efforts to practice the call of AA/NA to carry the message to other addicts and practice all the principles in all his affairs.

### The Board's Ruling

The Board concluded Montgomery was not suitable for parole as he posed an unreasonable risk of danger if released. The Board acknowledged the significant positive attributes reflected in Montgomery's record, including his educational and vocational achievements, positive chronos, diligence and work ethic, involvement in self-help and volunteer programs, parole plans, age, and his lack of an assaultive criminal history.

While commending Montgomery for his significant strides while in custody, the Board also noted the life offense weighed heavily against finding him suitable. The Board found that shooting a law enforcement officer with a rifle in the course of an ordinary traffic stop made the crime more egregious than a standard attempted murder. The Board was troubled by Montgomery's claims that he was an immature child at the time of the offense. Noting although he may have been immature, he was not a child. In fact, he and Deputy Pepper were both 23 years old at the time of the shooting. Montgomery also had a significant criminal history, albeit not a violent history. Montgomery's social history was unstable, including previous failed grants of diversion and probation and problematic and tumultuous familial relationships.

Montgomery claimed his experiences with police, their misuse and abuse of him, led him to the paranoid ideation that Deputy Pepper was going to kill him, but the Board found his history did not include any evidence of significant struggles, fights, or other issues with law enforcement and therefore did not support that ideation. The most time in custody he had ever spent was in county jail for about six months. Other than that, it was "ten days here, ten days there."

The Board also emphasized defendant's significant history of addiction as a heavy methamphetamine user. Although the Board acknowledged these were static factors, they gave the Board "reference as to where . . . you fall when stress hits you." The Board did not feel Montgomery had made sufficient changes to avoid those reactions in the future when faced again with significant stressors.

As to Montgomery's insight into the offense, the Board found he minimized his conduct, taking responsibility for taking the drugs, but blaming the drugs for making him paranoid. The Board believed this assertion reflected a lack of insight because "[t]he fact is that you were making or attempting to

cook methamphetamine, you were armed at the time, and clearly you were ready to rock and roll. You told somebody a week and a half, two weeks before that you didn't want to go back to jail, and you made every effort to keep from going back to jail when Mr. Pepper came on the scene." The Board also indicated it did not find Montgomery's accounts of the life offense credible. Specifically, the Board believed over the years he had gleaned information about what happened that evening and tried to present it in a way that would be acceptable to the Board.

The Board found the 115 a very significant factor in denying him parole. Given Montgomery's extensive history of addiction and the role that addiction played in the life offense, the Board found it troubling that he was in possession of a prohibited addictive substance. The Board was particularly troubled by this possession, given Montgomery's participation in AA/NA and tobacco cessation programs designed to address addictions. The Board assumed that Montgomery was planning to use the tobacco himself, as he had possessed it. Even accepting Montgomery's version of events, the Board remained troubled that he would "rub this into some poor guy's face who's trying to quit an addictive substance? It doesn't make us comfortable with your understanding of the program, your insight into addictive behavior and so forth. At a minimum, you're going out there as a joke to put these in front of this guy's face who is trying to break away from the cigarettes, and then to find out also that you're supporting his habit, he's borrowing money from you to go down that road." Under either scenario, the Board was not "comfortable with [Montgomery] being over his addictive tendencies, and the 115, while it is isolated, it is one that certainly flows down through your issues."

While the Board found Montgomery's institutional adjustment had been positive, it found he had programmed in a limited manner and believed his self-help and therapy had not enhanced his ability to function within the law upon release because of his lack of insight and understanding of the crime. The Board concluded Montgomery's lack of insight into the crime and the 115 for tobacco indicated his participating in self-help and therapy had not "germinated into true insight at this time and a true understanding of your addictive personality." Based on the foregoing, the Board issued a three-year denial of parole.

*Subsequent Procedural History*

Montgomery petitioned for a writ of habeas corpus. The trial court found the Board's decision was not supported by some evidence and granted his petition. Accordingly, the trial court vacated the September 2009 order of the Board and remanded the matter to the Board for a new hearing.

We denied the State's request for a stay of that hearing. The new hearing was conducted in July 2011, and the Board again denied Montgomery parole for a period of three years. We requested supplemental briefing from the parties on several issues, including whether this second hearing rendered the State's appeal moot.

The State answered our question regarding mootness in the negative, arguing that we could still provide relief by reversing the trial court's order. Montgomery agreed that the matter is not moot, but used his briefing to raise claims of alleged improprieties regarding the use of "confidential information" at his July 2011 hearing.

## DISCUSSION

### I

#### *Mootness*

An appeal should be dismissed as moot when the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief. (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 [98 Cal.Rptr.2d 202].) Here, the determinations of the trial court will govern respondent's future suitability hearings. (See *In re Prather* (2010) 50 Cal.4th 238, 258 [112 Cal.Rptr.3d 291, 234 P.3d 541].) In view of this fact, we conclude that the issues presented in this appeal are not moot.[5]

### II

#### *The Board's September 2009 Denial*

A. *The Law*

█ The Board must set a parole release date for parole-eligible inmates unless, after considering the various statutory and regulatory factors, the Board finds the inmate is unsuitable for parole because the inmate remains currently dangerous. (Pen. Code,[6] § 3041, subd. (b); *In re Lazor* (2009) 172 Cal.App.4th 1185, 1195 [92 Cal.Rptr.3d 36].) Our review of the Board's

---

[5] We decline to address Montgomery's claim, first raised in his supplemental briefing, that his July 2011 denial of parole was "improperly based" on " 'confidential information' from 2006." As we note *post*, our holding in the instant appeal will vacate the Board's July 2011 decision.

[6] Further undesignated statutory references are to the Penal Code.

parole-suitability determination focuses on whether there is " ' "some evidence" demonstrating that an inmate poses a current threat to public safety, rather than merely on whether some evidence supports the suitability factors.' [Citation.]" (*In re Shaputis* (2011) 53 Cal.4th 192, 209 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*).) We do not resolve conflicts in the evidence, determine the weight to be given the evidence or the precise manner in which the specified factors are considered and balanced. (*Shaputis II, supra*, 53 Cal.4th at p. 210.) It is not the court's role "to decide *which* evidence in the record is convincing." (*Shaputis II, supra*, at p. 211, original italics.) Our role on review is to ensure that the Board's "analysis of the public safety risk entailed in a grant of parole is based on a modicum of evidence, not mere guesswork." (*Id.* at p. 219.)

In conducting our review, we look not only at the evidence specified by the Board, but at the entire record to determine whether this modicum of evidence exists, and whether there is "a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Shaputis II, supra*, 53 Cal.4th at p. 221.) Importantly, we do not consider the ultimate issue of whether the inmate is currently dangerous. (*Ibid.*) If the Board's interpretation of the evidence is not arbitrary and reflects due consideration of the relevant factors, we must uphold it. (*Id.* at p. 212.) "Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor." (*Id.* at p. 211.)

### B. *Analysis*

At Montgomery's September 2009 hearing, the Board considered Montgomery's institutional record, including significant educational and vocational achievement, numerous positive chronos, a strong work ethic, significant participation in self-help and volunteer programs, parole plans, current age, lack of a violent criminal history, unstable social history, prior drug addiction and the role that addiction played in the life offense, and the egregiousness of the commitment offense. Thus the Board's decision reflected due consideration of the relevant statutory and regulatory factors. (See Cal. Code Regs., tit. 15, § 2402.)

Further, we cannot say the Board's decision was arbitrary. An inmate's understanding, current mental state and insight into factors leading to the life offense are highly probative "in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II, supra*, 53 Cal.4th at p. 218; see *In re Lawrence* (2008) 44 Cal.4th 1181, 1220 [82 Cal.Rptr.3d 169, 190 P.3d 535].) Here, the Board's denial was based on a lack of insight into

the *causative factors* of the life offense—including but *not limited to* substance abuse—and concerns about the progress Montgomery had made in gaining a true understanding of addiction.

### 1. *Lack of Insight—Causative Factors*

Montgomery explained his shooting of Deputy Pepper as the product of immaturity, bad experiences with law enforcement and drug-induced paranoid ideation. The Board did not find that explanation entirely credible. While it is clear, as the Board acknowledged, the shooting was committed while Montgomery was in the throes of a serious drug addiction, the shooting and its surrounding circumstances did not come about due to addiction alone. The Board did not believe Montgomery had adequate insight into other causative factors.

 Montgomery's explanation of the shooting as solely motivated by drug-induced paranoia and fear of law enforcement ignores that well before the shooting he had made clear to others his determination not to return to jail. Further, he was driving with a loaded rifle and 30 rounds of ammunition in his car. Montgomery's initial statement after the shooting confirmed that he had been frightened of *going back to jail*. It was not until 2004 that Montgomery first claimed the shooting occurred because he was paranoid of *being shot* by law enforcement.

As time went on, Montgomery continued to minimize his culpability for the offense by blaming it on drug-induced paranoia regarding potential harm to him by Deputy Pepper, rather than acknowledging that he effectively ambushed the deputy while on probation, speeding, in a car filled with drug precursors and paraphernalia, carrying a loaded rifle and extra ammunition, and admittedly seeking to avoid arrest on his outstanding warrants and the myriad of other offenses he was committing contemporaneously. These facts constitute the requisite "some evidence" to support the Board's finding that Montgomery lacked insight into the causative factors leading to his life offense.

### 2. *Addiction and the 115*

In 2003, Dr. Van Couvering concluded Montgomery's risk of future violence depended "upon his access to, and use of, drugs." In 2007, Dr. Rouse concluded that Montgomery's risk of dangerousness was low "if he continues to remain free of the temptations of drugs or alcohol." Most recently, Dr. Parsons concluded that *if Montgomery did not relapse into substance abuse*, his risk of recidivism was low-moderate. Dr. Parsons's evaluation also made clear there were deficiencies, in Montgomery's understanding of his vulnerability to addictive substances and he was not prepared

for appropriately handling destabilizing triggers. Based on this weakness, she recommended that he "conduct an in-depth reassessment and inventory of his progress towards sobriety and identify triggers to use methamphetamine that may derail him." Although Montgomery did follow some of Dr. Parsons's other recommendations, there is no indication in the record that he complied with this specific recommendation to identify what triggers his use of methamphetamine.

The Board concluded that Montgomery's possession of tobacco during the incident resulting in his 115 reflected failure of his antiaddiction programming, as he was found in possession of tobacco, a prohibited addictive substance, despite having participated in tobacco cessation programs. As detailed immediately *ante*, Montgomery's psychological evaluations make clear the connection between his risk of relapse into substance abuse and risk of violent reoffense. His possession of tobacco is some evidence that Montgomery has not adequately addressed the triggers for his tobacco addiction, may not possess the tools to prevent a relapse, and is willing to violate rules to satisfy his addiction—an addiction that is illegal to nurture in prison. In the context of a life crime in which addiction played such a significant role, we find there is a rational nexus between this evidence and Montgomery's current dangerousness.[7]

Even if we credit Montgomery's version of events surrounding the 115, we find some evidence of lack of understanding of addiction issues. Montgomery claimed he had been bartering ducats for tobacco with an inmate, Jeff, who was attempting to quit smoking, and he had intended to "play a joke" on Jeff and tempt him with (fake) tobacco. But Montgomery had expressed that his most significant accomplishment in prison related to his desire to give back by helping others address their addiction problems, to carry the message of AA/NA to other addicts, and practice all its principles in all of his affairs. His conduct in trying to "play a joke" on Jeff by tempting him was not consistent with these goals and claims. Montgomery's behavior even as he described it could reasonably be construed to constitute some evidence that despite Montgomery's participation in therapy and self-help programs, the programming had not "germinated into true insight at this time and a true understanding of [his] addictive personality." Because his addiction was such a large part of his violent conduct in committing the life offense, this evidence of lack of understanding and implementing what he may have learned about addiction has a rational nexus to a finding of current dangerousness.

---

[7] The 2008 psychological evaluation addressed the 115 violation and concluded it was not indicative of Montgomery's future violence. However, the evaluation did not discuss his previous tobacco cessation programming in connection with the 115. It also failed to address how an apparent failure in that programming related to the success—or failure—of Montgomery's AA/NA programming by relapse to methamphetamine, his drug of choice.

### 3. *Antisocial Behavior*

■ Lastly, a parole-suitability determination, and assessment of the current risk to public safety, includes an analysis by the Board of whether "the inmate will be able to live in society without committing additional antisocial acts." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174]; see *In re Roberts* (2005) 36 Cal.4th 575, 590 [31 Cal.Rptr.3d 458, 115 P.3d 1121].) For a life prisoner on parole, the inability "to comply with the reasonable controls imposed by the parole agent is an antisocial act." (*In re Reed* (2009) 171 Cal.App.4th 1071, 1085 [90 Cal.Rptr.3d 303] (*Reed*).) There is a rational nexus between a demonstrated unwillingness or inability to adhere to the reasonable conditions of parole and a current threat to public safety. (*Reed, supra,* 171 Cal.App.4th at p. 1075.) This is particularly true where, as here, the life offense was committed when the inmate was on probation.

Dr. Parsons noted Montgomery's 115 indicated "he may resist following rules of probation when it comes to substances that are forbidden for him to use but are not necessarily illegal in the community at large." Under either version of events, Montgomery's conduct violated the rules, either by being in possession of tobacco or in bartering ducats for tobacco with Jeff. Combined with the concerns about Montgomery's unreliable level of understanding of his vulnerability to addictive substances, and his inadequate preparation for facing destabilizing triggers, Montgomery's rule violation is some evidence of a risk to public safety and there is a rational nexus between that evidence and a finding of current dangerousness.

### C. *Conclusion*

On the record before us, we cannot say that the evidence "leads to but one conclusion." (*Shaputis II, supra,* 53 Cal.4th at p. 211.) Accordingly, we must affirm the Board's decision. Our Supreme Court had made it clear that we are not to reweigh the evidence, nor to substitute our own judgment for the Board's. We hold that some evidence—that is, "more than a modicum" (see *Shaputis II, supra,* 53 Cal.4th at p. 219)—supports the Board's finding of lack of insight into the causative factors leading to the life offense, as well as lack of insight into addiction issues, as evidenced by Montgomery's conduct leading to his 115. Due to the nature and characteristics of the life offense, there is a rational nexus between the Board's findings and its determination of current dangerousness.

Accordingly, we shall vacate the superior court's March 2011 order granting the petition for writ of habeas corpus and reinstate the Board's

September 2009 denial. This resolution also vacates the Board's July 2011 hearing. (*In re Copley* (2011) 196 Cal.App.4th 427, 435 [126 Cal.Rptr.3d 265].)

## DISPOSITION

The trial court's order granting the writ of habeas corpus is reversed. The trial court is directed to enter a new order denying writ relief. The Board's September 2009 order denying parole is reinstated.[8] The Board's July 2011 order denying parole is vacated.

Blease, Acting P. J., and Hull, J., concurred.

---

[8] We note that Montgomery's next parole hearing should be three years from the September 2009 denial of parole.