HAERLE, J., Dissenting.
I respectfully dissent from that portion of the majority’s opinion that agrees with appellant’s contention that the Board of Parole Hearings (the Board) decision was “arbitrary and unsupported by some evidence of his current dangerousness.” (Maj. opn., ante, at p. 601.) I do so for several reasons: (1) although my colleagues cite most of the relevant authority regarding the standard of review we are required to use in cases such as this, a standard made very clear by our Supreme Court in In re Shaputis (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (Shaputis II), they fail to apply the core “modicum of evidence” test articulated in that case to the record before us; (2) they effectively ignore the ample evidence in the record supporting the Board’s decision and, instead, set forth why, in their view, the Board should have decided this case differently; and (3) finally, they overlook some of the specific legal points made by the Shaputis II court and other facts present in the record of this case. (Id. at p. 208.)
A. The Governing Law
In concluding its unanimous decision in Shaputis II, our Supreme Court listed five factors governing review by the judicial branch of Board decisions regarding suitability for parole. (Shaputis II, supra, 53 Cal.4th at pp. 220-221.) In the interest of brevity, I will not quote them all but note that the first point is that the “essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety.” (Id. at p. 220.) The second point is that the Board and the Governor “draw their answers” to that question “from the entire record, including ... the insight he or she has achieved into past behavior.” (Id. at p. 221.)
The court then concluded with these two important governing principles:
“4. Judicial review is conducted under the highly deferential ‘some evidence’ standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision.
“5. The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the *636 court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence.” (Shaputis II, supra, 53 Cal.4th at p. 221, italics added.) As, I believe, it also did in In re Young (2012) 204 Cal.App.4th 288 [138 Cal.Rptr.3d 788], I submit that the majority effectively ignores these standards here. There is clearly a “modicum of evidence” supporting the Board’s decision.[1] That evidence falls into two categories: first, his continued lack of insight and, second, his failure to adequately recognize and deal with his alcohol addiction.
Since the publication of Shaputis II a little over a year ago, several of our sister courts have recognized its clear meaning and import.[2] Thus, in In re Mims (2012) 203 Cal.App.4th 478, 486 [137 Cal.Rptr.3d 682], our colleagues in Division Two of the Fourth District wrote: “Under the ‘some evidence’ standard, only a modicum of evidence is required to uphold a decision regarding suitability for parole. ([Shaputis II; supra,] 53 Cal.4th 192 In re Rosenkrantz [(2002)] 29 Cal.4th [616,] 677 [128 Cal.Rptr.2d 104, 59 P.3d 174].) It is not for the reviewing court to decide which evidence in the record is convincing. (Shaputis II, at p. 211.) While the standard is not ‘toothless’ and ‘ “must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights” [citation], it must not operate so as to “impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch” [citation].’ (Id. at p. 215.) Thus, when the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary. (Ibid.)”
Others of our sister courts have also stressed the significance of Shaputis II. Thus, another division of the Fourth District recently wrote in In re Tapia (2012) 207 Cal.App.4th 1104, 1113 [144 Cal.Rptr.3d 190]: “The rule of In re Palermo [(2009) 171 Cal.App.4th 1096 [90 Cal.Rptr.3d 101]] has been called into question by the Supreme Court’s decision in [Shaputis IT], supra, 53 Cal.4th at pages 214-215, in which the court held the record must be viewed in the light most favorable to the Board’s decision, and that when ‘the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary.’ The Board’s decision in this case does not lack any rational basis, and is not merely arbitrary.”
*637 Later in 2012, the Third District also recognized the change wrought by Shaputis II. In In re Montgomery (2012) 208 Cal.App.4th 149, 164 [145 Cal.Rptr.3d 109], that court wrote: “On the record before us, we cannot say that the evidence ‘leads to but one conclusion.’ (Shaputis II, supra, 53 Cal.4th at p. 211.) Accordingly, we must affirm the Board’s decision. Our Supreme Court had made it clear that we are not to reweigh the evidence, nor to substitute our own judgment for the Board’s. We hold that some evidence— that is, ‘more than a modicum’ (see Shaputis II, supra, 53 Cal.4th at p. 219)—supports the Board’s finding of lack of insight into the causative factors leading to the life offense, as well as lack of insight into addiction issues, as evidenced by Montgomery’s conduct leading to his 115 [(a penal rules violation report)]. Due to the nature and characteristics of the life offense, there is a rational nexus between the Board’s findings and its determination of current dangerousness.” As a result of this conclusion, the Third District vacated a pve-Shaputis II order of the superior court granting that petitioner’s habeas corpus petition.
Finally, earlier this year, our colleagues in the Sixth District also recognized the significance of Shaputis II in In re Stevenson (2013) 213 Cal.App.4th 841 [152 Cal.Rptr.3d 457] (Stevenson). In that case, the Sixth District reversed a trial court’s grant of habeas corpus relief and, in so doing, summarized the importance of Shaputis II in redefining the posture of the courts in reviewing Board decisions: “The California Supreme Court clarified the courts’ role in reviewing parole suitability decisions in its recent opinion in Shaputis II, supra, 53 Cal.4th 192. ‘The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety.’ (Id. at p. 220.) The Board or the Governor draws the answers to that question ‘from the entire record, including the facts of the offense, the inmate’s progress during incarceration, and the insight he or she has achieved into past behavior.’ (Id. at p. 221.) ‘The inmate’s insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration’ (Id. at p. 219.) The Board and the Governor may consider ‘the inmate’s understanding of the crime and the reasons it occurred, or the inmate’s insight into other aspects of his or her personal history relating to future criminality.’ (Id. at p. 220.) As indicated, ‘a parole suitability decision is an “attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.” [Citations.]’ (Id. at p. 219.) [f] ‘Judicial review is conducted under the highly deferential “some evidence” standard.’ ([Shaputis II,] at p. 221, [fn. omitted by this court].) ‘The “some evidence” standard is intended to guard against arbitrary parole decisions, without encroaching on the broad authority granted to the Board and the Governor. [Citations.]’ (Id. at p. 215.) ‘The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision.’ (Id. at p. 221, italics added.) *638 ‘[C]ourts consider only whether some evidence supports the ultimate conclusion that the inmate poses an unreasonable risk to public safety if released. [Citation.]’ (Id. at p. 219.) [][] The ‘some evidence’ standard of review does not equate to the more demanding ‘substantial evidence’ standard of review. ([Shaputis II,] at p. 214.) But similar to a court reviewing the substantiality of the evidence, a court reviewing a parole unsuitability determination by the Board or the Governor ‘must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole. [Citations.]’ (Ibid.) ‘The court is not empowered to reweigh the evidence.’ (Id. at p. 221.) ‘It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.’ [Citation.] [f] ‘Any relevant evidence that supports the parole authority’s determination is sufficient to satisfy the “some evidence” standard. [Citation.]’ ([Shaputis II,] at p. 214, fn. omitted.) Moreover, a court’s deferential ‘some evidence’ review is not limited to the evidence mentioned by the Board or the Governor. (Id. at p. 214, fn. 11.) ‘Only when the evidence reflecting the inmate’s present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process. [Citation.]’ (Id. at p. 211, italics added.)” (Stevenson, supra, 213 Cal.App.4th at pp. 865-867.)
Later in its opinion, the Sixth District noted: “The Board could reasonably conclude that petitioner had not yet fully developed the insight and coping skills necessary to ‘live in society without committing additional antisocial acts.’ [Citation.] There was a rational nexus between the evidence and the panel’s ultimate determination of current dangerousness; a modicum of evidence supports its decision to deny parole. This is not a case where a court is compelled to overturn the Board’s decision because ‘the evidence reflecting the inmate’s present risk to public safety leads to but one conclusion’ (Shaputis II, supra, 53 Cal.4th at p. 211), one contrary to the Board’s decision. The ‘some evidence’ standard is satisfied.” (Stevenson, supra, 213 Cal.App.4th at pp. 870-871.)[3]
*639 B. Petitioner’s Lack of Insight
Contrary to the majority, I believe there is substantial evidence in the record, indeed well more than the required “modicum of evidence,” of petitioner’s current “lack of insight.” In Shaputis II, our Supreme Court explicitly noted, toward the start of its discussion of “The Insight Factor,” that recently “a great many parole denials have focused on the inmate’s lack of insight” and that this factor has been noted by many recent Court of Appeal decisions. (Shaputis II, supra, 53 Cal.4th at p. 217.) And the court clearly thought that such was appropriate; it stated that its prior decisions “have expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a ‘rational nexus’ between the inmate’s dangerous past behavior and the threat the inmate currently poses to public safety. [Citations.]” (Id. at p. 218.) The court then added: “[I]t is noteworthy that lack of insight pertains to the inmate’s current state of mind, unlike the circumstances of the commitment offense .... Therefore, the most recent evidence of the inmate’s degree of insight will usually bear most closely on the parole determination . . . .” (Id. at pp. 219-220.)
I submit that petitioner’s lack of insight into both why he murdered Michael Kane and attempted to murder the latter’s mother, Mildred Irwin, on April 8, 1986, has been rather consistent since his commission of these acts. The Board remained concerned that he could not and did not explain why he attacked the two victims when he did, and thus lacked the required insight; it concluded that petitioner had “absolutely no understanding of how this life crime happened.” I agree with the Board and, in so doing, specifically rely upon the following evidence in the record.
First, there was clearly some evidence in the record that petitioner has continued to minimize the violence involved in the crimes. In 2009, he told his psychological evaluator that he remembered telling Irwin that he wanted to talk with her, and then going out into a hallway where “[i]t seemed like somebody jumped on me full force from the back. It felt like that. Maybe [Kane] was trying to protect his mother, but I don’t know. I don’t remember anything else.” But the following year, at the hearing, when asked what he recalled about the crimes, he replied: “I don’t remember what happened” and “I don’t recall what happened, actually.” A few minutes later, petitioner told the Board it was “a mystery” to him why the crimes happened. Later in the hearing, when then asked about his statement the previous year that someone had jumped on him “full force from the back,” he replied that he had been “speculating.”
*640 All of this suggests continued confusion on the part of petitioner as to the reasons for his violent actions on the evening in question. Further, his willingness to “speculate” about what caused him to begin his murderous violence—and to do so without identifying it as “speculation”—constituted an implied justification for some if not all of his reaction, clearly constitutes “some evidence” that he continues to resist considering fully—and indeed does not now understand fully—why he acted as he did and to take full responsibility for his actions. It also supports the Board’s concern about petitioner’s versions of the events that led up to the violence and death.
Second, there was also clearly “some evidence” that petitioner was in denial regarding his violent tendencies toward Irwin, a matter of concern given the fact that he attempted to murder her when he killed her 17-year-old son, Michael Kane. In 2009, he told the evaluator that he had routine arguments in his relationships with women and, while conceding that he had indeed knocked down his second wife, denied that he had “ever hit a woman.” This statement ignores three things: (1) his murderous conduct toward Irwin, whom he shot at and struck with a gun on the night of the commitment offenses; (2) Irwin’s 1987 report to the probation officer that petitioner had been violent toward her on the two previous separate occasions, the first time hitting her and the second time swinging at her; and (3) the probation officer’s report that petitioner had attended an alcohol treatment program “after hitting victim Irwin during an alcoholic blackout.” Based on this evidence—-almost all of it ignored by the majority—petitioner’s 2009 denial that he has “ever hit a woman” was then, and remains now, “some evidence” of a lack of insight.
Third, the psychologist who evaluated petitioner in 2009 stated that he had “moderate insights” regarding his history of alcohol abuse—to be discussed further below—including his history of use of alcohol to relieve his emotional distress and the role his childhood traumas, i.e., the abuse he suffered from his older brother, played in his drinking and rage. However, that psychologist concluded that, while petitioner “has gained insight into several of the factors that contributed to the offense, including his severe abuse of alcohol,” he had “less insight into the reasons for his rage at the time of the offense.”
Fourth, the Board’s focus on petitioner’s lack of insight was particularly appropriate in light of the significant danger involved in his consumption of alcohol. According to the 1987 evaluator, if petitioner were to drink, he could well engage in “almost automatic aggressive behavior” without the ability to exercise social judgment. Although there is some evidence, noted below, that petitioner had undertaken limited efforts to come to terms with his alcohol abuse, his limitations on those efforts suggest his further resistance to fully *641 explore and resolve the reasons he acted as he did on the night of the murder and assault. As our Supreme Court noted in Shaputis II, “the inmate’s insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration.” (Shaputis II, supra, 53 Cal.4th at p. 219.)
I respectfully submit that all of these factors, especially when combined, undermine the majority’s conclusion that “an inmate’s lack of insight into the causes of his criminal conduct cannot rationally be inferred from his inability to remember the conduct where, as in this case, he acknowledges his factual, legal and moral responsibility for the criminal act, and has expressed genuine remorse.” (Maj. opn., ante, at p. 629.)[4] This statement is, I submit, unjustified because, among other things, of (1) petitioner’s initial recollection of someone jumping on his back, (2) his subsequent suggestion that he was “speculating” regarding the reasons for his committing the murder and assault, and (3) his denial that he had ever “hit a woman.” Even more unjustified is the majority’s characterization of the Board’s finding of petitioner’s continuing lack of insight as “remarkable” and “irrational.” (Maj. opn., ante, at pp. 631, 632.) For all of the reasons set forth above, I submit that there is clearly “some evidence” supporting that finding.
Rather than acknowledging that there is, indeed, a “modicum of evidence” supporting the Board’s finding, the majority clearly reevaluates the evidence in the record and, based on that reevaluation, concludes that petitioner shows “suitability for release.” (Maj. opn., ante, at p. 622; see generally id. at pp. 622-625.) In this section of their opinion, the majority devotes considerable attention to “factors,” “regulatory factors,” and “suitability factors” the Board’s decision “never considers,” “ignores,” or to which it shows “indifference.” (Maj. opn., ante, at pp. 624, 623, 625.) And it specifically acknowledges that it does so “to show the Board’s failure to consider a substantial body of evidence in the record” showing petitioner’s suitability “for release on parole.” (Maj. opn., ante, at.p. 625.)
I respectfully submit that this rather obvious reevaluation of the record before the Board is totally contrary not only to our Supreme Court’s mandate of “the highly deferential ‘some evidence’ standard” of appellate review of Board decisions (Shaputis II, supra, 53 Cal.4th at p. 221), but also to the recent decisions of our sister courts that have clearly understood that (1) it “ ‘is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole,’ ” and (2) the “decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed.” (Stevenson, *642 supra, 213 Cal.App.4th at pp. 866, 868, quoting from, respectively, In re Rosenkrantz, supra, 29 Cal.4th at p. 677, and Shaputis II, supra, 53 Cal.4th at p. 221.)
C. The Issue of Petitioner’s Alcohol Addiction
As noted above, the fact that the record clearly establishes a lack of insight by petitioner of the reasons for his murdering of Kane and assaulting Irwin is not the only reason I dissent from the majority’s opinion. I also have no difficulty in concluding that the Board’s concern about petitioner’s limited efforts to address his long-standing alcohol abuse problem was supported by “some evidence,” indeed, again, much more than the “modicum of evidence” mandated by Shaputis II. Although much of the background regarding petitioner’s alcohol addiction problem is discussed in the factual portion of the majority’s opinion, it is mentioned only briefly in the substantive portion of that opinion. I frankly find this puzzling, because petitioner’s failure to fully deal with his alcohol addiction problem during his incarceration was clearly one of the bases for the Board’s decision not to grant him parole.
Petitioner, relying on a variety of cases, argues that the Board improperly relied on its concern about his limited progress in Alcoholics Anonymous (AA), because rehabilitative programming is not significant unless evidence indicates a prisoner will remain dangerous in the absence of the programming. (See, e.g., In re Ryner (2011) 196 Cal.App.4th 533, 551 [126 Cal.Rptr.3d 380] [“the significance of rehabilitative programming comes into play only when after years of such programming a prisoner is unable to gain insight into his antisocial behavior despite those years of therapy and rehabilitative programming”].) According to petitioner, his history of alcohol abuse does not render him currently dangerous in light of his alcohol-free, violence-free, and almost entirely discipline-free 24-year incarceration, as well as positive evaluation comments about his programming, impulse control, and lack of procriminal attitudes or values.
Petitioner argues there is “no evidence that completing only the first five steps of the 12-Step Program . . . made [petitioner] currently dangerous[],” particularly in light of his evaluators’ findings about his low risk of dangerousness when sober. He also contends he presented convincing evidence that he effectively utilized the Native American Spiritual Circle as a sobriety program. Therefore, he contends, the Board’s emphasis of the AA 12-step program was arbitrary and capricious, based on mere opinion and speculation, not evidence, and not a basis for finding parole unsuitability.
Petitioner’s arguments are not persuasive in light of the circumstances of his case. In In re Morganti (2012) 204 Cal.App.4th 904 [139 Cal.Rptr.3d *643 430], this court addressed the difficulties of evaluating the current dangerousness of a prisoner who, although presently sober, has a preincarceration history of substance abuse. We concluded that “[t]he risk a former drug or alcohol abuser will relapse, which can never be entirely eliminated, cannot of itself warrant the denial of parole, because if it did the mere fact an inmate was a former substance abuser would ‘eternally provide adequate support for a decision that [he] is unsuitable for parole.’ ” (Id. at p. 921.) We held that “[t]he risk an inmate may fall back into alcohol or drug abuse can justify denial of parole only where it is greater than that to which a former drug or alcohol abuser is normally exposed.” (Ibid.)
I believe there is clearly “some evidence” that the risk petitioner could well revert to alcohol abuse upon release is greater than that to which a former alcohol abuser is normally exposed because of the severity of his problem with alcohol, his lack of insight into why he acted as he did (which I have already discussed), and his limited progress in coming to terms with alcohol abuse. Petitioner’s arguments about AA versus his Native American Spiritual Circle miss the point. There is clearly “some evidence” to support the Board’s concerns about his limited progress in AA, both because of (1) petitioner’s own acknowledgment of its role in his recovery (he intends to continue with it, including after his release), and (2) his partial and limited involvement in both AA and the Native American Spiritual Circle.
The undisputed record indicates that, prior to the commitment offenses, petitioner persistently abused alcohol for decades, through divorces, lost jobs, completion of at least five treatment programs, his own leadership role in an alcohol treatment program’s youth group, acts of violence, and his imminent breakup with Irwin before her mother’s stroke. Furthermore, his alcohol abuse was directly associated with blackouts, during which he sometimes engaged in acts of violence without the ability to exercise customary social judgment, including the murder of Kane and attempted murder of Irwin. The Board could reasonably conclude that petitioner’s risk of relapse into alcohol abuse was particularly dangerous, and could very well lead to further acts of violence that petitioner could not control.
Nonetheless, petitioner’s recognition of his alcohol abuse and efforts to come to terms with it have been extremely slow. Despite his history and the role of alcohol in the commitment offenses, petitioner conceded that he did not understand that he suffered from alcoholism until 2002, notwithstanding the fact that he was imprisoned in 1987. Even then, he waited four more years before beginning participation in AA. And even after four years of participation, he has completed only the first four steps of the 12-step program. Thus, the Board had reason to be concerned that his work in AA, while commendable, was not yet sufficient, particularly given (1) his long *644 history of abuse and violence while under the influence of alcohol, (2) his multiple failed rehabilitation attempts, and (3) the key fact that he committed the murder and assault while, apparently, intoxicated. Which was why the psychologist who examined him a year before the hearing concluded that “[t]he primary concern continues to be the history of severe abuse of alcohol and the risk of relapse in the community.” That “primary concern” is particularly pertinent here because, as noted above, of petitioner’s only-partial participation in AA. But that primary concern and its bases are, unfortunately, simply not addressed or considered in the majority’s opinion.
Petitioner contends that his participation in the Native American Spiritual Circle and related activities since 1995 is equivalent to his participation in AA. Although the record contains some support for the argument that the nature of the Spiritual Circle is such that it is equivalent to a sobriety program, there is also substantial evidence that petitioner’s participation in it has not reduced the risk of his relapse upon release for at least two reasons.
First, although the record indicates petitioner began his participation in the Spiritual Circle in 1995, he dates his recognition of his alcoholism back to around 2002. This gap of approximately seven years suggests that, whatever the nature of the Spiritual Circle, it did not sufficiently focus his attention on his alcoholism for a long time, raising a legitimate question about its effectiveness as an equivalent to AA.
Second, petitioner told the Board that the Native American Spiritual Circle has four roads, but his statements to the Board emphasized only the road involving introspection, which he analogized to the first five steps of AA. This suggests that he has also made limited progress in the Spiritual Circle—even assuming it is the functional equivalent of AA.
In short, I conclude that “some evidence” supports the Board’s denial of petitioner’s parole because, specifically, of his clear failure to adequately address his alcohol abuse problem.
D. My Other Problems with the Majority Opinion
Finally, and in addition to the points made above regarding the “modicum of evidence” supporting the Board’s decision, I respectfully submit that the majority opinion ignores other realities in both the applicable law and the record in this case.
First of all, the majority repeatedly argues that there was insufficient evidence before the Board that was “rationally indicative of [petitioner’s] current dangerousness.” (Maj. opn., ante, at p. 616; see pp. 624, 630.) I *645 respectfully remind my colleagues of our Supreme Court’s unanimous statements that: “The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness.” (Shaputis II, supra, 53 Cal.4th at p. 221.) I submit that the majority opinion does not do so.
Second, the majority states that “nothing in the record calls into question the authenticity of petitioner’s lack of recall.” (Maj. opn., ante, at p. 630.) But there surely is: see (1) my discussion above regarding his statement regarding someone jumping on him “full force from the back,” (2) his semiretraction of the same as “speculation,” and (3) his completely incorrect statement that he had never “hit a woman.” (Ante, at pp. 605-607.)
Third, as the presiding commissioner said in announcing the Board’s decision in March 2010 after hearing the testimony of petitioner: “I know you say you don’t remember, but if you don’t remember, at least you should have some kind of understanding of how this happened, and you don’t even have an understanding [of] how this crime happened. There was absolutely no understanding of how this life crime happened, and without you understanding how it happened, we don’t understand how it could not happen in the future.” With all due respect to my colleagues, they do not attempt to rebut this conclusion of the Board, a conclusion clearly supported by the psychologist’s 2009 conclusion that petitioner had “less insight into the reasons for his rage at the time of the offense.”
E. Conclusion
I concur with the Attorney General that “Stoneroad’s minimal participation in Alcoholics Anonymous—combined with his commitment offense and lack of insight into his crime—constitutes some evidence to support the Board’s decision.” And this was written a month before our Supreme Court’s decision in Shaputis II, a decision that substantially reinforces that conclusion.
Further, and as noted above, the majority’s decision repeatedly cites evidence in the record, which it believes points in petitioner’s favor, and asserts that the Board failed “to consider a substantial body of evidence in the record to that effect.” (Maj. opn., ante, at p. 625.) But Shaputis II makes it abundantly clear that this is not at all the relevant standard of review. That standard is “whether a modicum of evidence supports the parole suitability decision.” (Shaputis II, supra, 53 Cal.4th at p. 221.) I submit that it clearly does here.
*646 Finally, I conclude by quoting our colleagues in the Sixth District in their recent opinion in Stevenson, an opinion that reflects that court’s understanding of the significance of Shaputis II: “We accept the majority’s decision and our review in this case is governed by the court’s opinion in Shaputis II. (See Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] [‘Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction.’].)” (Stevenson, supra, 213 Cal.App.4th at p. 868.)
I respectfully submit that this court should do likewise.

 The relevant standard is not, as the majority suggests, whether there is “a modicum of evidence in the record rationally indicative of current dangerousness . . . .” (Maj. opn., ante, at p. 616.) It is, rather, whether there is a “modicum of evidence [which] supports the parole suitability decision.” (Shaputis II, supra, 53 Cal.4th at p. 221.)

 In addition to the cases discussed below, see In re Shigemura (2012) 210 Cal.App.4th 440, 454-455 [148 Cal.Rptr.3d 230].

 To me, one of the most interesting points of Shaputis II is the brief concurring opinion of Justice Chin. (See Shaputis II, supra, 53 Cal.4th at p. 221 (conc. opn. of Chin, J.).) There, Justice Chin stated: “I dissented in In re Lawrence (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (Lawrence). I believed then, and still believe, the majority opinion in that case was ill considered. Lawrence is largely responsible for the confusion in the Courts of Appeal that today’s opinion seeks to ameliorate. However, my view in Lawrence did not prevail, and I now accept the majority view. For this reason, I concur entirely in this case.” I suggest this comment by Justice Chin is not only correct, but also makes clear that, as I said in a recent dissent, “the relevant universe has changed considerably since the issuance of’ Lawrence. (In re Young, supra, 204 Cal.App.4th at p. 320, fn. 1.) And it is changed, of course, because of the *639 unanimous opinion in Shaputis II, a decision which, I believe, renders Lawrence to no longer be, as the majority suggests, the “seminal decision” in this area of the law. (Maj. opn., ante, at p. 625.) I suggest that description now belongs to Shaputis II.

 They also, I submit, render inappropriate the majority’s characterization of the Board’s attention to this'issue as “relentless fixation.” (Maj. opn., ante, at p. 630.)